**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STORMANS INC., doing business as
RALPH'S THRIFTWAY; RHONDA
MESLER; MARGO THELEN,
            *Plaintiffs-Appellees,*

        v.

MARY SELECKY, Secretary of the
Washington State Department of
Health; LAURIE JINKINS, Assistant
Secretary of Washington Health
Systems Quality Assurance;
GEORGE ROE; SUSAN TIEL BOYER;
DAN CONNOLLY; GARY HARRIS;
VANDANA SLATTER; REBECCA HILLE;
ROSEMARIE DUFFY, Members of the
Washington Board of Pharmacy;
ELLIS CASSON; DEBORAH SIOUS
CANO-LEE; JERRY HEBERT; SHAWN
MURINKO, Commissioners for the
Washington Human Rights
Commission; MARK BRENMAN,
Executive Director of the
Washington Human Rights
Commission; YVONNE LOPEZ
MORTON, acting Commissioner of
the Human Rights Commission of
the State of Washington,
            *Defendants-Appellants,*

       and

Nos. 07-36039
      07-36040

D.C. No.
CV-07-05374-RBL
Western District of
Washington,
Tacoma

ORDER

Judith Billings; Rhiannon
Andreini; Jeffrey Schouten;
Molly Harmon; Catherine
Rosman; Emily Schmidt; Tami
Garrard,
                    *Defendant-Intervenors-*
                              *Appellants.*

Filed May 1, 2008

Before: Thomas G. Nelson, A. Wallace Tashima and
Jay S. Bybee, Circuit Judges.

Order;
Dissent by Judge Tashima

## ORDER

The Plaintiffs-Appellees filed suit in district court to enjoin the enforcement of Washington Administrative Code 246-863-095(4)(d) and 246-869-010(4)(d). Those regulations, as enforced by the Washington State Board of Pharmacy, prohibit pharmacies and pharmacists from refusing to dispense a contraceptive known as "Plan B" or the "morning after" pill. The district court granted the preliminary injunction on the grounds that enforcement of the regulations would interfere with the rights of the Plaintiffs-Appellees under the Free Exercise Clause of the U.S. Constitution. Defendant-Intervenors seek a stay pending appeal of the district court's preliminary injunction in this case.

There are four factors we consider when presented with a motion for a stay pending appeal:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies.

*Golden Gate Restaurant v. City and County of San Francisco*, 512 F.3d 1112, 1115 (9th Cir. 2008) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). We have recently explained that to satisfy steps (1) and (2), we will accept proof either that the applicant has shown "a *strong* likelihood of success on the merits [and] . . . a *possibility* of irreparable injury to the [applicant]," or "that *serious* legal questions are raised and that the balance of hardships tips *sharply* in its favor." *Id.* at 1115-16 (emphasis added; citations omitted). We have described these alternative formulations as " 'two interrelated legal tests' that 'represent the outer reaches of a single continuum.' " *Id.* at 1115 (quoting *Lopez v. Heckler*, 713 F.3d 1432, 1435 (9th Cir. 1983)).

The motion to stay the district court's injunction is denied. Even assuming the district court erred in concluding that the Washington regulations violate the Free Exercise Clause, there is insufficient evidence that Appellant-Intervenors will face irreparable harm if the injunction remains in effect pending appeal.

The district court found that "there has been no evidence presented to the Court that access [to Plan B] is a problem. It is available at all but a few licensed pharmacies in Washington state and can be accessed through physicians offices, certain government health centers, hospital emergency rooms, Planned Parenthood and the internet." The district court also relied on a survey conducted by the Washington State Board of Pharmacy. Of the 135 pharmacies surveyed, "93 typically stocked emergency contraceptives while 28 did not. Of those who did not, 18 cited low demand and three relied on an 'easy

alternative source.' Only two pharmacies said they did not stock emergency contraceptives because of religious or personal reasons." The district court concluded:

> The Court has been presented no evidence establishing that anyone in the State of Washington, including intervenors, has ever failed to obtain Plan B within the 72-hour window of effectiveness because one or more pharmacists-pharmacies refused to fill a lawful prescription for Plan B or refused to stock and/or dispense Plan B as an over-the-counter drug.

In their application for a stay pending appeal, the Defendant-Intervenors do not controvert these findings. Instead, they cite other evidence — which was before the district court and discussed in its order — of two women who sought Plan B and were refused by a pharmacist, a woman who has heard that Plan B is not available at pharmacies and obtained Plan B from Planned Parenthood, and a woman who has not used Plan B but participated in a Planned Parenthood testing program and made inquiries at five pharmacies. The most serious cases are those of the two women who were refused Plan B by pharmacists; neither woman was unable to obtain Plan B. In the one case, the pharmacist directed the woman to another pharmacy in the area; in the second case, another pharmacist on duty at the store filled the prescription. There is no evidence that any woman who sought Plan B was unable to obtain it. This anecdotal evidence falls short of even the "possibility of irreparable harm" in the absence of a stay pending appeal.

Accordingly, upon the record before the court, a stay of the district court's injunction is not warranted.

Appellant-Intervenors' alternative motion to expedite oral argument of these cases is granted. These cases have been calendared for oral argument on June 3, 2008 in Seattle, Wash-

ington. Appellees' motion to continue oral argument will be addressed by separate order.

---

TASHIMA, Circuit Judge, dissenting, in part:

Defendants-Intervenors appeal from the district court's grant of a preliminary injunction, enjoining Washington's amended pharmacy regulations (the "regulations").[1] They have moved for a stay of the injunction pending appeal. Because the stay applicants have demonstrated a strong likelihood of success on the merits, at least the possibility of irreparable harm, and that the public interest weighs in their favor, I would stay the district court's preliminary injunction pending appeal. I dissent from the denial of a stay.

## I. Factual and Procedural Background

In Washington, pharmacy practice is governed by a comprehensive regulatory scheme administered by the Washington State Board of Pharmacy (the "Pharmacy Board"). *See* Wash. Rev. Code § 18.64.005. In 2006, responding to media reports and complaints about pharmacists who refused to fill certain prescriptions, including the so-called Plan B contraceptive, the Pharmacy Board initiated a rulemaking process to address what, if anything, should be done about pharmacies and pharmacists who refuse to dispense certain drugs because they believe those drugs to be religiously or morally objectionable. This issue has proven to be controversial.

---

[1]The heart of the regulations provides:

> Pharmacies have a duty to deliver lawfully prescribed drugs or devices to patients and to distribute drugs and devices approved by the U.S. Food and Drug Administration for restricted distribution by pharmacies, or provide a therapeutically equivalent drug or device in a timely manner consistent with reasonable expectations for filling the prescription. . . .

Wash. Admin. Code § 246-869-010(1).

The controversy boils down to this: To women's health advocates, Plan B is a necessary component of a woman's reproductive freedom and health. When a woman and her sexual partner's primary contraception fails, or when they fail to use a contraceptive, Plan B gives a woman a second opportunity to prevent a pregnancy. The medication is not taken prophylactically, but instead is taken post-coital. Its efficacy at preventing a pregnancy, however, is time-sensitive. Delaying the first dose even by several hours substantially increases the odds of pregnancy, and its efficacy diminishes linearly with time. *See* Frank Davidhoff & James Trussell, *Plan B and the Politics of Doubt*, 296 JAMA 1775, 1775 (2006).

To opponents of Plan B, the drug is not a contraceptive but an abortifacient. That is, they argue that Plan B does not prevent pregnancy, but terminates it. At least some pharmacists (and pharmacy owners) share that view and also believe that terminating a pregnancy is morally wrong, violates religious precepts, or both. To these pharmacists, participating in the dispensing of Plan B would be violative of their deeply held religious or moral beliefs. Pursuant to that belief, some refuse to dispense Plan B. Therefore, to women's health advocates, religious and moral objectors stand between their reproductive health and freedom, putting women at risk of unintended or unwanted pregnancies. To pharmacists-objectors, a requirement to dispense drugs that they find morally or religiously objectionable presents a dilemma, forcing them to choose between their work as a pharmacist and their deeply-held moral and religious beliefs.[2]

During the Washington rulemaking process, some, most notably the Washington State Pharmacy Association

---

[2]Although Plan B is now available over-the-counter, it must be stocked behind the pharmacy counter and must be requested by the patient, and it is available to women under 18 only by prescription. Thus, the OTC status of Plan B for adults has not removed the pharmacist from the dispensing of the drug.

("WSPA"), advocated for the creation of a right to refuse for pharmacists, while others, including Planned Parenthood, the Northwest Women's Law Center, and the Washington State Human Rights Commission ("WSHRC"), advocated against any right to refuse. Following input from these groups and interested individuals, the Pharmacy Board initially proposed a draft rule that would have allowed pharmacists to refuse to dispense a medication that the pharmacists found morally or religiously objectionable, but proscribed pharmacists or pharmacies from actively obstructing a patient's effort to obtain lawfully prescribed drugs.

This proposal was met with prominent opposition. Governor Christine Gregoire publicly voiced her opposition to the proposed rule. In a letter to the Pharmacy Board, the Governor focused on the "patient perspective," arguing that "no one should be denied appropriate prescription drugs based on the personal, religious, or moral objection of individual pharmacists"; instead, "the bottom line . . . [is that] a lawful prescription should be filled unless there are clinical or patient safety issues." The Governor publicly warned the Pharmacy Board that she could remove them should they not reconsider their initial proposal, but she was nevertheless hopeful that it would not to come to that.

The Governor eventually brought several interest groups together, including the WSPA and Planned Parenthood, and together, they offered an alternative to the proposed draft rule. The Pharmacy Board unanimously adopted the Governor's brokered alternative, requiring pharmacies to dispense all lawfully prescribed drugs, or a therapeutic equivalent, in a timely manner, *see* Wash. Admin. Code § 246-869-010, and defining unprofessional conduct on the part of pharmacists to include destroying or refusing to return an unfilled lawful prescription, violating a patient's privacy, discriminating against patients, or intimidating or harassing a patient, *see id.* § 246-863-095. The regulations do not recognize a right of refusal for pharmacists, but they do not preclude a pharmacy from

accommodating an objecting pharmacist so long as another pharmacist is available to fill prescriptions. As the Pharmacy Board, in a post-adoption letter, informed pharmacies and pharmacists, "[t]he rule does not mandate that individual pharmacists dispense all prescriptions regardless of the pharmacist's personal objection," but "a pharmacy cannot avoid filling prescriptions by referring [the patient] to another pharmacy" even if the only pharmacist on duty has personal objections. The regulations became effective on July 26, 2007.

The day before the regulations' effective date, Stormans Inc., which operates two pharmacies in Olympia, Washington, Rhonda Mesler, and Margo Thelen, who are Washington pharmacists (collectively, "Plaintiffs"), brought a First Amendment free exercise challenge to the regulations.[3] Plaintiffs believe that Plan B is an abortifacient and that the use of such a drug is violative of their sincerely-held religious beliefs. Plaintiffs argue that the regulations violate their free exercise rights, contending that the regulations intentionally seek to suppress their religious practices because the regulations force them to choose between their livelihood and the exercise of their religion. Amend. Comp. at 9-13. Immediately upon filing their complaint, Plaintiffs moved for a preliminary injunction, seeking to enjoin the State from enforcing the regulations against them. Following filing of the motion for preliminary injunction, three women who have been refused Plan B in the past, two women who may need timely access to Plan B in the future, and two HIV-positive individuals who need timely access to medications to manage their illness (collectively, "Defendants-Intervenors"), intervened pursuant to Federal Rule of Civil Procedure 24(a).

The district court, concluding that Plaintiffs had demonstrated a likelihood of success on their free exercise challenge

---

[3]Plaintiffs also brought equal protection, preemption, and procedural due process challenges to the regulations, *see* Amend. Comp. at 13-17, but the preliminary injunction was based only on free exercise grounds.

and a possibility of irreparable injury, granted the preliminary injunction. *Stormans, Inc. v. Selecky*, 524 F. Supp. 2d 1245, 1266 (W.D. Wash. 2007). Instead of enjoining the State from enforcing the regulations only against Plaintiffs, however, the district court enjoined the State from enforcing the regulations against *any* pharmacy or pharmacist:

> The defendants are enjoined from enforcing [Wash. Admin. Code] 246-863-095(4)(d) and [Wash. Admin. Code] 246-869-010(4)(d) (the anti-discrimination provisions) against any pharmacy which, or pharmacist who, refuses to dispense Plan B but instead immediately refers the patient either to the nearest source of Plan B or to a nearby source for Plan B.

*Id.* Perhaps recognizing that the injunction was overbroad, Plaintiffs moved to narrow the injunction so that it would apply only to the named plaintiffs and the employers of the named-objecting pharmacists. That motion was denied. Defendants-Intervenors appealed from the granting of the preliminary injunction and requested a stay from the district court, which was denied. They have now moved this court for a stay of the preliminary injunction pending appeal.

## II.   Standard for Granting a Stay Pending Appeal

To determine whether we should grant a stay pending appeal, we consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *accord Golden Gate Rest. Ass'n v. City & County of S.F.*, 512 F.3d 1112, 1115 (9th Cir. 2008); *Natural Res. Def. Council, Inc. v. Winter ("Winter I")*,

502 F.3d 859, 863 (9th Cir. 2007); *Lopez v. Heckler*, 713 F.2d 1432, 1435-36 (9th Cir. 1983).

The "irreparably-injured" and "likelihood-of-success" factors are considered on "a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Golden Gate*, 512 F.3d at 1116 (quoting *Winter I*, 502 F.3d at 862). Where the stay applicant demonstrates a strong likelihood of success, the *possibility* of irreparable injury is sufficient to warrant a stay. *See Golden Gate*, 512 F.3d at 1115-16; *Winter I*, 502 F.3d at 862. On the other end of the sliding scale, where the stay applicant demonstrates that the balance of hardships tips sharply in its favor, the applicant must show only that it raises "serious legal questions." *Golden Gate*, 512 F.3d at 1116; *Lopez*, 713 F.2d at 1435. The "public interest" factor is considered "separately from and in addition to whether the applicant for stay will be irreparably injured absent a stay." *Golden Gate*, 512 F.3d at 1116 (quoting *Winter I*, 502 F.3d at 863); *accord Hilton*, 481 U.S. at 776.

### III.　Discussion

Although essentially acknowledging that Defendants-Intervenors are likely to succeed on the merits, the majority nevertheless denies their motion for a stay, holding that "there is insufficient evidence that Appellant-Intervenors will face irreparable harm." In so holding, the majority misconstrues the law and the record. I consider each of the stay factors, in turn.

### A.　*Success on the Merits*

The applicants have demonstrated a strong likelihood of success on the merits because, contrary to the district court's holding, the Washington regulations do not violate Plaintiffs' rights to the free exercise of religion. Because the majority

virtually concedes that stay applicants meet this factor,[4] I touch on the merits only to explain why the district court erred in this regard.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the *free exercise thereof* . . . ." U.S. Const. amend. I (emphasis added). The Free Exercise Clause excludes all regulation of religious beliefs, but does not exclude the regulation of religiously-motivated actions so long as the regulation is neutral and generally applicable. That is, a rationally based neutral law of general applicability, even when it proscribes (or prescribes) conduct that a particular individual's religion prescribes (or proscribes), does not violate that individual's free exercise right. *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "A law is one of neutrality and general applicability if it does not aim to 'infringe upon or restrict practices *because of their religious motivation*,' and if it does not 'in a selective manner impose burdens *only on conduct motivated by religious belief*.'" *San Jose Christian Coll. v. Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) (emphasis added) (quoting *Lukumi*, 508 U.S. at 533, 543). A neutral and generally applicable law will be upheld if it is rationally related to a legitimate governmental purpose. *Smith*, 494 U.S. at 879

### 1. *Neutrality*

A law is neutral if its object is not aimed at infringing upon or restricting practices "*because* of their religious motivation." *Lukumi*, 508 U.S. at 533 (emphasis added); *accord San Jose Christian Coll.*, 360 F.3d at 1031. To determine the object of the law, we must examine both the text of the regulation (allowing us to ensure facial neutrality), and how the

---

[4]The majority "assum[es that] the district court erred in concluding that the Washington regulations violate the Free Exercise Clause. . . ."

regulation operates (allowing us to ferret out facially neutral laws that nevertheless have as their object the infringement or restriction of religious practices because of their religious motivations). *See Lukumi*, 508 U.S. at 533-40.

As noted, "we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* at 533. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Id.* Here, the regulations, as all concede, are facially neutral. The regulations do not refer, in any way, to religious practice or belief. They operate neutrally against religiously-based conduct, as well as secularly-based conduct. The regulations require pharmacies to fill valid, lawful prescriptions. Patients cannot be denied drugs because of a particular pharmacist's religious objections, moral objections, or any other kind of personal objection. Moreover, because the regulations proscribe a pharmacy from refusing to dispense valid, lawful prescriptions and do not require a particular pharmacist to dispense all valid, lawful prescriptions, nothing in the regulations precludes a particular pharmacy from accommodating a pharmacist-objector. In short, there is no indication, either from the language of the regulations or from the manner in which they operate, that the object of the regulations is aimed at infringing upon or restricting practices "*because* of their religious motivation." *Lukumi*, 508 U.S. at 533 (emphasis added); *accord San Jose Christian Coll.*, 360 F.3d at 1031.

Even though the text and the operation of the regulations are neutral, the district court nevertheless concluded that the regulations were not neutral. It reached that conclusion by relying on the regulations' administrative history, reasoning that "[r]elevant evidence in the inquiry [to determine whether the regulations are neutral] includes, at a minimum, the historical background of the decision under challenge, the specific series of events leading to the enactment of the subject law(s), and the legislative or administrative history, including con-

temporaneous statements made by members of the decision-making body." *Stormans*, 524 F. Supp. 2d at 1258.

In employing that line of reasoning, the district court applied the wrong legal standard. In *Lukumi*, Justice Kennedy delivered the opinion of the Court, except as to Part II-A-2 of his opinion. *See* 508 U.S. at 523. The passage quoted by the district court, regarding the consideration of the legislative history in determining whether the challenged regulation had a discriminatory object, is from Part II-A-2 of Justice Kennedy's *Lukumi* opinion, which was not part of the majority opinion of the Court. *Compare Stormans*, 524 F. Supp. 2d at 1258 (quoting, without citing, *Lukumi*), *with Lukumi*, 508 U.S. at 540-42 (plurality opinion). Rather, under *Lukumi*, even if the Pharmacy Board "set out resolutely to suppress the [religious] practices of [Plaintiffs], but ineptly adopted [regulations] that failed to do so," those regulations could not be said to prohibit the free exercise of religion. 508 U.S. at 558-59 (Scalia, J., concurring in part and concurring in judgment). Thus, the district court's discussion of the regulations' administrative history is beside the point.

Even assuming *arguendo* that the district court could consider administrative history, the district court's conclusion that the administrative history "strongly suggests that the overriding objective of the subject regulations was, to the degree possible, to eliminate moral and religious objections from the business of dispensing medication," *Stormans*, 524 F. Supp. 2d at 1259, would not lead to the conclusion that the regulations were not neutral. The district court recognized that the Pharmacy Board was trying to eliminate religious *as well as secularly-based* moral objections. *Id.* (concluding that the "overriding objective of the subject regulations was, to the degree possible, to eliminate moral and religious objections from the business of dispensing medication"). The district court, however, incorrectly treats moral objections and religious objections as interchangeable, even though moral objections to abortion are not necessarily religiously-based. *Cf.*

*Ariz. Life Coalition, Inc. v. Stanton*, 515 F.3d 956, 972 (9th Cir. 2008) (concluding that speech opposing abortion is not speech that promotes faith or a specific religion). Indeed, the fact that the Pharmacy Board sought to prevent religious *and* moral objections from interfering with patients' access to prescriptions demonstrates that the State was not regulating religiously-motivated conduct because of its religious motivation.

For example, in *American Life League, Inc. v. Reno*, the Fourth Circuit held that the Freedom of Access to Clinic Entrances Act ("FACE"), which prohibits obstructing abortion clinics, was a neutral and generally applicable law even though Congress enacted the law in response to abortion clinic blockades, many of which were motivated by the religious beliefs of the obstructors. 47 F.3d 642, 654 (4th Cir. 1995). In that case, the plaintiffs argued that the object of the law was to restrict the protests because of the protestors' religious motivations. The Fourth Circuit, however, rejected that argument because "[u]nder the Act it makes no difference whether a violator acts on the basis of religious conviction or temporal views. The same conduct is outlawed for all." *Id.* Thus, the law was generally applicable and neutral toward religion, and as such, it did not offend the Free Exercise Clause. *Id.* Here, the regulations, like FACE, proscribe the same conduct for all, regardless of whether the pharmacist refuses to fill the prescription based on religious, moral, temporal, or other objections.

Because the regulations are facially neutral and do not operate in a way that demonstrates that the object of the regulations is aimed at infringing upon or restricting religious practices or beliefs because of their religious motivation, the regulations are neutral.

### 2. *Generally Applicable*

A regulation is not generally applicable when it pursues the "governmental interests only against conduct motivated by

religious belief." *Lukumi*, 508 U.S. at 545. The general applicability requirement insures that government "cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543; *see also San Jose Christian Coll.*, 360 F.3d at 1031. In other words, "[t]he Free Exercise Clause protects religious observers against unequal treatment, and inequality results when a legislature [or an administrative agency] decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi*, 508 U.S. at 542-43.

The district court, however, invented a new test to determine whether the challenged regulations are generally applicable. It held that a law is not generally applicable "if the [challenged regulations'] means fail to match [the] ends" employed by the regulator, and concluded that the "means," *i.e.*, the challenged regulations, failed to achieve their intended end because the regulations allowed for certain exceptions[5] from the general duty to dispense lawful prescriptions. *See Stormans*, 524 F. Supp. 2d. at 1260-63. Although acknowledging that these "exemptions all reflect legitimate, time-honored reasons for not filling a prescription immediately upon presentation by a patient," the district court nevertheless concluded that these exemptions make the regulations not generally applicable because the "means adopted by the Board to accomplish its desired outcome . . . does nothing to increase access to lawful medicines generally." *Id.* at 1262.

General applicability simply does not require what the district court demands. The district court's "means" and "end" test is, in essence, a version of intermediate scrutiny. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 197 (1976) ("To withstand constitutional challenge, . . . classifications by gender must serve

---

[5]For example, the regulations exempt pharmacies from that general duty when the prescription cannot be filled because of a national emergency or the lack of expertise with a given medicine, or when the prescription is potentially fraudulent. *See* Wash. Admin. Code § 246-869-010(1)(a)-(e).

important governmental objectives and must be substantially related to the achievement of those objectives."). Under intermediate scrutiny, a regulation will be upheld if it is substantially related to an important governmental objective. The district court applied the wrong legal standard, and in so doing, introduced a heightened scrutiny to a neutral law of general applicability—a level of scrutiny that runs contrary to the rule of *Smith* and *Lukumi*.

General applicability requires only that the burden not be imposed *only* on religiously-motivated conduct. *Cf. Lukumi*, 508 U.S. at 524 ("[T]he principle of general applicability was violated [in that case] because the secular ends asserted in defense of the laws were pursued only with respect to conduct motivated by religious beliefs."). Here, the regulations burden both religious and secular objections to the dispensing of certain drugs; therefore, they are generally applicable.

### 3. *Rational Basis Review*

Because the challenged regulations are neutral and generally applicable, rational basis review applies. *See Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999) (citing *Smith*, 494 U.S. at 879). Under rational basis review, the regulations will be upheld if they are rationally related to a legitimate governmental purpose. *See Gadda v. State Bar*, 511 F.3d 933, 938 (9th Cir. 2007). Here, the regulations are rationally related to Washington's legitimate interest in ensuring that patients have their lawful prescriptions dispensed without delay.

*Smith* and *Lukumi* require only that the regulations treat religious belief and practice no differently than secularly-motivated belief and practice. The regulations do just that. The Supreme Court has never held that the Free Exercise Clause creates a private right to ignore generally applicable laws. Instead, it declared that the creation of such a right would be "a constitutional anomaly." *Smith*, 494 U.S. at 882, 885-86.

> "Laws," [the Supreme Court has] said, "are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices . . . . Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself."

*Id.* at 879 (quoting *Reynolds v. United States*, 98 U.S. 145, 166-67 (1879) (ellipsis in the original) (rejecting the argument that the Free Exercise Clause precludes the application of criminal bigamy laws to individuals whose religion commanded the practice)). "The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of governmental action on a religious objector's spiritual [integrity]." *Id.* at 885 (internal citations and quotation marks omitted). Defendants-Intervenors have demonstrated that, in all probability, they will prevail on the merits.

## B.  *Balance of Hardships*

Given that Defendants-Intervenors have demonstrated a strong likelihood of success on the merits, they need show only the *possibility* of irreparable injury if the stay is not granted. *See Golden Gate*, 512 F.3d at 1115-16 (citing *Winter I*, 502 F.3d at 862). The majority holds that "there is no evidence that any woman who sought Plan B was unable to obtain it. This anecdotal evidence falls short of even the 'possibility of irreparable harm' in the absence of a stay pending appeal." In so holding, the majority completely misconstrues the meaning of the term "possibility of irreparable harm."

The panel's decision to deny the stay means that Defendants-Intervenors will be placed at risk that the dispens-

ing of Plan B will be delayed, potentially resulting in unwanted pregnancies and all that accompanies it. The record shows that five of the Defendants-Intervenors are sexually active women in their childbearing years.[6] Rhiannon Andreini uses condoms as her primary means of birth control and has already experienced the ill effects of a pharmacist who refuses to dispense Plan B. Andreini, while on a family visit, sought the emergency contraceptive because her partner's condom had broken during sexual intercourse. She was denied access to Plan B by a Washington pharmacist, and had to cut her family visit short in order to obtain Plan B from a familiar pharmacist. Such delays in treatment create the possibility of an unwanted pregnancy. The risk of another delay and an unintended pregnancy is real. Molly Harmon also has experienced a pharmacist's refusal to dispense Plan B after her primary contraception failed. Harmon was also able to obtain Plan B, preventing an unwanted pregnancy, but Harmon will continue to be at risk of having the dispensing of emergency contraception delayed or denied. Catherine Rosman has used Plan B following a sexual assault. In the event of another sexual assault, emergency contraception may be delayed or denied, placing her at risk of conceiving a child from a sexual assault. Emily Schmidt and Tami Garrard, although they have never used emergency contraception, are nonetheless placed at risk of having emergency contraception delayed or denied. If this showing does not amount to a showing of the "possibility of irreparable harm," it is difficult to conceive of a showing that would.[7]

---

[6]The other two Defendants-Intervenors are HIV-positive individuals who need timely access to medication in order to manage their illness. I do not consider their hardship because the preliminary injunction pertains only to refusals to dispense Plan B.

[7]Rejecting the showing of *possible* harm as "anecdotal," the majority's denigration of the risk — the *possibility* — of irreparable harm faced by Defendants-Intervenors, as well as all women of child-bearing age in Washington, runs counter to our assessment of irreparable injury in *Golden Gate*. There, after noting that approximately 20,000 uninsured work-

On the other side of the balance is Rhonda Mesler's contention that if the Pharmacy Board enforces the regulations against the pharmacy for which she works, she "expect[s]" to be fired, because she will refuse to dispense Plan B and the pharmacy cannot afford to hire another pharmacist. Even assuming that Mesler's employer will terminate her if it is required to comply with the regulations, when " '[f]aced with . . . a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly' in favor of the latter." *Golden Gate*, 512 F.3d at 1126 (quoting *Lopez*, 713 F.2d at 1437). The remaining plaintiffs, Margo Thelen and Stormans Inc., have not shown that they will suffer any irreparable harm if the injunction is stayed.[8] Thelen has religious and moral objections to the dispensation of Plan B, but has been accommodated by her employer. Stormans contends that it will suffer irreparable harm because the Pharmacy Board has "express[ed] an intent to initiate disciplinary proceedings" should Stormans fail to comply. Such an economic injury, however, could hardly be considered irreparable. I conclude that the balance of hardships tips strongly in favor of the stay applicants.

Because the stay applicants have demonstrated a substantial likelihood of prevailing on the merits, they need only demonstrate a possibility of irreparable harm, which they have clearly shown.

---

ers would be eligible for health benefits under the contested ordinance and that "individuals without health coverage are significantly less likely to seek timely medical care than those with coverage," because "the Intervenors' injuries include preventable human suffering," we concluded that "the balance of hardships tips sharply in favor of the parties seeking [stay] relief." *Golden Gate*, 512 F.3d at 1125-26.

[8]I assume, for purposes of the stay motion, that Stormans, as a corporation, has a protectible free exercise right under the First Amendment.

## C.   *The Public Interest*

The district court also erred by failing to consider the public interest before granting the injunction.[9] We have, however, an independent duty to consider the public interest. *Winter I*, 502 F.3d at 864 (citing *Hilton*, 481 U.S. 770). The public interest analysis in a stay is in part subsumed in the analysis of the balance of hardship to the parties. *See Golden Gate*, 512 F.3d at 1126. The public interest analysis, however, is much wider, because there are many women who are not parties to this suit whose access to emergency contraception is obstructed by the preliminary injunction. *Id.* Thus, the stay places women throughout Washington at risk of having access to emergency contraception delayed or denied, and thus places them at risk of having unintended pregnancies. On the other side, particular pharmacies may not accommodate all pharmacists-objectors, and it is possible that pharmacies will choose to terminate objecting pharmacists, causing financial hardship to those pharmacists. Considering all the various interests, I conclude that the public interest weighs in favor of granting the stay.

Moreover, the public interest consideration is constrained in this case because the responsible public officials in Washington have already considered the various implicated interests. *See Golden Gate*, 512 F.3d at 1126-27 ("[O]ur consideration of the public interest is constrained in this case, for the responsible officials . . . have already considered that interest. Their conclusion is manifested in the [regulations] that is the subject of this appeal."). The regulations were adopted by the Pharmacy Board after a lengthy public comment period, which included more than 21,000 written comments. I am "not sure on what basis a court could conclude that the public interest is not served by a [regulation] adopted in such a fashion. Perhaps it could so conclude if it were obvious that the [regulations are] unconstitutional . . . ; but, as evi-

---

[9]The majority, too, fails to consider the public interest.

denced by [my] analysis [of the free exercise challenge] above, [I] think the opposite is likely to be held true." *Id.* (citing *Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy.")).

I conclude that the public interest is served by staying the district court's preliminary injunction.

## IV. Conclusion

Granting a pharmacist the right to refuse to fill a lawful prescription for whatever reason is not constitutionally required. *See Smith*, 494 U.S. at 890. "It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious" objections that do not enjoy majority support; "but that unavoidable consequence of democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs." *Id.* The district court's understanding of the free exercise doctrine is at odds with clearly established Supreme Court and Circuit case law. The State of Washington through its Legislature has entrusted regulation of its pharmacy system to the Pharmacy Board. The Pharmacy Board has spoken, and it has done so consistent with the Constitution. Because Defendants-Intervenors have met all of the requirements for a stay of the preliminary injunction pending appeal, their motion for a stay should be granted. I respectfully dissent from the panel's refusal to issue a stay.

I concur in that part of the Order granting Defendants-Intervenors' alternative motion to expedite oral argument.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2008 Thomson Reuters/West.