**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STORMANS, INC., doing business as
Ralph's Thriftway; RHONDA
MESLER; MARGO THELEN,
                *Plaintiffs-Appellees,*

v.

MARY SELECKY, Secretary of the
Washington State Department of
Health; LAURIE JINKINS, Assistant
Secretary of Washington Health
Systems Quality Assurance;
GEORGE ROE; SUSAN THIEL BOYER;
DAN CONNOLLY; GARY HARRIS;
VANDANA SLATTER; REBECCA HILLE;
ROSEMARIE DUFFY, Members of the
Washington Board of Pharmacy;
ELLIS CASSON; DEBORAH SIOUS
CANO-LEE; JERRY HEBERT; SHAWN
MURINKO, Commissioners for the
Washington Human Rights
Commission; MARK BRENMAN,
Executive Director of the
Washington Human Rights
Commission; YVONNE LOPEZ
MORTON acting Commissioner of
the Human Rights Commission of
the State of Washington,
                *Defendants-Appellants,*

No. 07-36039

D.C. No.
CV-07-05374-RBL

14405

and

JUDITH BILLINGS; RHIANNON
ANDREINI; JEFFREY SCHOUTEN;
MOLLY HARMON; CATHERINE
ROSMAN; EMILY SCHMIDT; TAMI
GARRARD,
            *Defendant-intervenors.*

STORMANS, INC., doing business as
Ralph's Thriftway; RHONDA
MESLER; MARGO THELEN,
            *Plaintiffs-Appellees,*

v.

MARY SELECKY, Secretary of the
Washington State Department of
Health; LAURIE JINKINS, Assistant
Secretary of Washington Health
Systems Quality Assurance;
GEORGE ROE; SUSAN THIEL BOYER;
DAN CONNOLLY; GARY HARRIS;
VANDANA SLATTER; REBECCA HILLE;
ROSEMARIE DUFFY, Members of the
Washington Board of Pharmacy;
ELLIS CASSON; DEBORAH SIOUS
CANO-LEE; JERRY HEBERT; SHAWN
MURINKO, Commissioners for the
Washington Human Rights
Commission; MARK BRENMAN,
Executive Director of the
Washington Human Rights
Commission,
            *Defendants,*

and

YVONNE LOPEZ MORTON, acting Commissioner of the Human Rights Commission of the State of Washington,

*Defendant-Appellant,*

JUDITH BILLINGS; RHIANNON ANDREINI; JEFFREY SCHOUTEN; MOLLY HARMON; CATHERINE ROSMAN; EMILY SCHMIDT; TAMI GARRARD,

*Defendant-intervenors-Appellants.*

No. 07-36040

D.C. No. CV-07-05374-RBL

ORDER AND OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
July 8, 2008—Seattle, Washington

Filed October 28, 2009

Before: Kim McLane Wardlaw, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Wardlaw

## COUNSEL

Kristen K. Waggoner, Seattle, Washington, for the plaintiffs-appellees.

Alan D. Copsey, Assistant Attorney General, Olympia, Washington, for defendants-appellants.

Rima J. Alaily, Seattle, Washington, for the defendants-intervenors-appellants.

## ORDER

Appellees' petition for panel rehearing is GRANTED. The prior opinion filed on July 8, 2009, and reported at 571 F.3d 960 is vacated concurrent with the filing of a New Opinion today.

The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc is DENIED. Subsequent petitions for panel rehearing and for rehearing en banc may be filed with respect to the New Opinion.

IT IS SO ORDERED.

**OPINION**

WARDLAW, Circuit Judge:

We must decide whether the district court abused its discretion by preliminarily enjoining the enforcement of new rules promulgated by the Washington State Board of Pharmacy ("Board") that require pharmacies to deliver lawfully prescribed Federal Drug Administration ("FDA")–approved medications and prohibit discrimination against patients, on the ground that the rules violate pharmacies' or their licensed pharmacists' free exercise rights under the First Amendment to the U.S. Constitution. We have jurisdiction pursuant to 28 U.S.C. § 1292. Because we conclude that the district court incorrectly applied a heightened level of scrutiny to a neutral law of general applicability, and because the injunction is overbroad, we vacate, reverse, and remand.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The practice of pharmacy in the state of Washington is regulated by the Washington State Board of Pharmacy pursuant to a comprehensive regulatory scheme which directs the Board to "[r]egulate the practice of pharmacy and enforce all laws placed under its jurisdiction," "[e]stablish the qualifications for licensure," conduct disciplinary proceedings, and "[p]romulgate rules for the dispensing, distribution, wholesaling, and manufacturing of drugs and devices and the practice of pharmacy for the protection and promotion of the public health, safety, and welfare." Wash. Rev. Code Ann. § 18.64.005. Under the Code, a license is required for "any person to practice pharmacy or to institute or operate any pharmacy." *Id.* at § 18.64.020. A "pharmacist" is defined as "a person duly licensed by the Washington state board of pharmacy to engage in the practice of pharmacy," *id.* at § 18.64.011(10), and a "pharmacy" is defined as "every place properly licensed by the board of pharmacy where the practice of pharmacy is conducted," *id.* at § 18.64.011(12). The

"practice of pharmacy" "includes the practice of and responsibility for: [i]nterpreting prescription orders [and] the compounding, dispensing, labeling, administering, and distributing of drugs and devices," in addition to information-sharing and monitoring responsibilities. *Id.* at § 18.64.011(11).

In January 2006, the Board became concerned with the lack of clear authority regarding destruction or confiscation of lawful prescriptions and refusals by pharmacists to dispense lawfully prescribed medications. Recognizing the importance of providing Washington patients timely access to all medications, the Board initiated a rulemaking process to address these issues. For sixteen months, the Board considered its various rulemaking options, receiving 21,000 written comments and testimony from the public and various interest groups. Pursuant to the Washington Administrative Procedure Act, Wash. Rev. Code Ann. § 34.05.325, the Board conducted well-attended hearings on the proposed rules.

Some public comments addressed the availability of a variety of prescription medicines and devices, such as syringes, prenatal vitamins, oral contraceptives, and AIDS medications. Most of the comments, however, focused on whether pharmacists should be allowed to refuse to dispense a lawful prescription for Plan B based on their personal, moral, or religious beliefs.

Approved by the FDA on July 28, 1999, Plan B is a post-coital hormonal emergency contraceptive which contains the same hormones as ordinary birth control pills, estrogen and progestin, in much stronger dosages. It is used to prevent pregnancy after the intended method of birth control fails or after unprotected sexual activity. Plan B is most effective within the first 12 to 24 hours after sexual intercourse and becomes less effective with each passing hour. It should be taken within 72 hours of sexual intercourse. After 120 hours, it has no effect. Plan B is approved for over-the-counter dis-

pensation nationwide to adults eighteen and over. The drug must be held behind the pharmacist's counter and can be sold to any adult, male or female, upon age verification. At the time of the district court's decision, females younger than eighteen were required to present a medical prescription to obtain the drug.[1]

The drug is generally available to Washington residents through pharmacies, physicians' offices, government health centers, hospital emergency rooms, Planned Parenthood, the Internet, and a toll-free hotline. Seventy-seven percent of Washington pharmacies, responding to a sample survey of 121 pharmacies conducted before the adoption of the challenged new rules,[2] typically stock Plan B. Those who did not cited low demand (15 percent)[3] or an easy alternative source (2 percent). Only two pharmacies (2 percent) surveyed did not stock the drug because of personal, religious, or moral objections. If the survey is accurate and representative, that translates into approximately 27 of the 1,370 licensed pharmacies in Washington. The survey does not reveal how many pharmacists in the state decline to dispense the drug.

One of the comments received by the Board during its rulemaking process was set forth in an April 17, 2006, letter from the Washington State Human Rights Commission's ("HRC") Executive Director, Marc Brenman. HRC was created by the legislature and is authorized to act to prevent discrimination

---

[1]As of April 22, 2009, pursuant to a court order, the FDA had notified the manufacturer of Plan B that it may, upon submission and approval of an appropriate application, market Plan B without a prescription to women seventeen years of age and older.

[2]We acknowledge that the survey may not accurately reflect the current state of affairs. We expect that on remand, the district court will be provided with more recent and comprehensive data.

[3]According to the survey, 72 percent of pharmacies in the state of Washington had less than 25 requests for Plan B per year. Nearly 13 percent had between 26 and 50 requests; 6 percent had between 51 and 100 requests; and 11 percent had greater than 100 requests.

in violation of the Washington Law Against Discrimination ("WLAD"). Wash. Rev. Code Ann. § 49.60.010. It may issue and investigate complaints, attempt conciliation, or refer matters to the Attorney General's Office for a hearing before an administrative law judge. *Id.* §§ 49.60.230, .250; Wash. Admin. Code §§ 162-08-071 to -190. HRC is not authorized to make a final determination that discrimination occurred or to issue penalties. *See* Wash. Rev. Code Ann. § 49.60.240. HRC is authorized to comment on rules being considered by other agencies or state officials. *See id.* § 49.60.110 ("[HRC] shall formulate policies to effectuate the purposes of this chapter and may make recommendations to agencies and officers of the state or local subdivisions of government in aid of such policies and purposes."). It was under this authority that the Executive Director submitted a letter to the Board, which concluded:

> It is illegal and bad policy to permit pharmacists to deny services to women based on the individual pharmacists' religious or moral beliefs. We have examined the issue from federal and state law perspectives, from the public interest, and from possible defenses and compromises that could be raised and made. On no ground would refusal to fill a lawful prescription for emergency contraception be appropriate.

The letter also posited that any pharmacy or pharmacist who declined to dispense Plan B for any reason engaged in sex discrimination in violation of federal and state law, even if another on-site pharmacist filled the prescription. It concluded that the Board itself risked liability under WLAD if it were to permit such refusals.

After considering a number of draft rules,[4] the Board

---

[4]The first draft of the rule allowed a pharmacist to refuse to fill a lawful prescription if another on-site pharmacist would dispense the medication

adopted two rules by unanimous vote on April 12, 2007. The first rule, an amendment to Washington Administrative Code section 246-863-095, governs pharmacists. Under this rule, a pharmacist may be subject to professional discipline for destroying or refusing to return an unfilled lawful prescription, violating a patient's privacy, or unlawfully discriminating against, or intimidating or harassing a patient. The rule, however, does not require an individual pharmacist to dispense medication in the face of a personal objection.

The second rule, Washington Administrative Code section 246-869-010, governs pharmacies. It requires pharmacies "to deliver lawfully prescribed drugs or devices to patients and to distribute drugs and devices approved by the U.S. Food and Drug Administration for restricted distribution by pharmacies . . . in a timely manner consistent with reasonable expectations for filling the prescription." A pharmacy may substitute a "therapeutically equivalent drug" or provide a "timely alternative for appropriate therapy," but apart from certain necessary exceptions,[5] a pharmacy is prohibited from refusing to

without delay. One of the second drafts required pharmacists to fill lawful prescriptions, but the alternative second draft allowed a pharmacist to refuse and refer a patient to another provider. The third draft did not require pharmacies to fill lawful prescriptions and allowed pharmacies and pharmacists to refuse to dispense a medication. In response to that draft, Washington State Governor Christine Gregoire offered the assistance of her office to help the Board work toward a solution to prevent the potentially deleterious effects of allowing pharmacists to refuse to dispense legally prescribed medication on the basis of unlimited and illegitimate reasons. A fourth draft was negotiated, but subsequent substantive changes to it precluded agreement. Finally, two more drafts were prepared for public comment, the text of which corresponded substantially with the final rules.

[5] *See* Wash. Admin. Code §§ 246-869-010(1)(a)-(e), (2) (exempting pharmacies from the general duty to deliver when the prescription cannot be filled due to lack of payment, because it may be fraudulent or erroneous, or because of declared emergencies, lack of specialized equipment or expertise, or unavailability of a drug despite good faith compliance with Washington Administrative Code section 246-869-150, which provides in part that "[t]he pharmacy must maintain at all times a representative assortment of drugs in order to meet the pharmaceutical needs of its patients").

deliver a lawfully prescribed or approved medicine. A pharmacy is also prohibited from destroying or refusing to return an unfilled lawful prescription, violating a patient's privacy, or unlawfully discriminating against, or intimidating or harassing a patient.

In the Concise Explanatory Statement accompanying the regulations, the Board noted that it created a right of refusal for individual pharmacists by allowing a pharmacy to "accommodate" a pharmacist who has a religious or moral objection. A pharmacy may not refer a patient to another pharmacy to avoid filling a prescription because the pharmacy has a duty to deliver lawfully prescribed medications in a timely manner. A pharmacy may accommodate a pharmacist's personal objections in any way the pharmacy deems suitable, including having another pharmacist available in person or by telephone.

The regulations took effect on July 26, 2007.

Stormans, Inc., doing business as Ralph's Thriftway, a grocery store in Olympia, Washington, which also operates a pharmacy, and individual pharmacists Rhonda Mesler and Margo Thelen (collectively, "Appellees"), filed a lawsuit pursuant to 42 U.S.C. § 1983 on July 25, 2007, the day before the effective date of the rules, in the U.S. District Court for the Western District of Washington.[6] They allege as-applied vio-

---

[6]Named defendants are members of the Pharmacy Board, representatives of the Department of Health as well as the Executive Director and every member of HRC (collectively, "State Appellants"), including Mary Selecky, Secretary of the State of Washington Department of Health ("Department"); Laurie Jinkins, Assistant Secretary of the Department; George Roe, Susan Thiel Boyer, Dan Connolly, Gary Harris, Vandana Slatter, Rebecca Hille, Rosemarie Duffy, members of the Washington State Board of Pharmacy; Mark Brenman, Executive Director, and Yvonne Lopez Morton, Ellis Casson, Deborah Sious Cano-Lee, Jerry Hebert, Shawn Murinko, members of the Washington State Human Rights Commission.

lations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the Supremacy Clause, and Title VII. They ultimately seek a permanent prohibition against enforcement of the new rules and the Washington State antidiscrimination law, WLAD, Wash. Rev. Code Ann. § 49.60, against "pharmacists and pharmacies that object to dispensing Plan B on moral or religious grounds."

Appellees assert that their personal religious views do not permit them to dispense Plan B, and, consequently, they refuse to provide Plan B to patients who request it. They claim that the Board's rules impinge on their constitutional right of free exercise of religion, arguing that the rules force them to choose between their religious beliefs as Christians and their livelihood.

The two individual pharmacists claim that by compelling their employers to hire another pharmacist to work with them during their shift—an accommodation about which their employers have expressed varying degrees of concern—the regulations will cause them to voluntarily leave their jobs or be terminated. Mesler has so far remained with her employer, who accommodated her during the five months between the effective date of the new rules and the issuance of the preliminary injunction. Mesler alleges, however, that without the court's injunction, she expects to be fired, because her employer has told her that it would not be able to accommodate her. Thelen voluntarily resigned from her former employment to work at a pharmacy that accommodates her religious belief by ensuring there is always another pharmacist on duty.

Stormans, which is owned by Ken Stormans and his three children, claims that it has been under investigation since May 2006, and that the Board is investigating complaints that its pharmacy has refused to stock or sell Plan B. In his declaration, Vice President Kevin Stormans states that he received a phone call in May 2006 asking whether Ralph's Thriftway

carried Plan B. He did not know the answer and did not know much about the drug. After a pharmacy employee told him that Ralph's did not carry Plan B because customers had not requested it, he told the caller that the store did not carry the product. Soon afterwards, Stormans received a few other inquiries as to why Ralph's did not stock Plan B. These inquiries prompted Kevin Stormans to research Plan B. After he learned that Plan B can prevent a fertilized egg from implanting in the uterus, and because Stormans's owners believe life begins with fertilization, Stormans decided that it would not sell the drug.

In the summer of 2006, the Board began investigating Ralph's Thriftway and questioned Kevin Stormans, requiring a written statement. Though the Board closed that investigation without taking any action, in January 2007, the Board initiated a new investigation against Ralph's. Kevin Stormans asserts that the matter has been referred to the Board's legal counsel for final review. After Stormans filed suit, the Board began a new investigation of Ralph's under the new rules. This investigation is pending. Stormans expects that the Board's investigation will result in disciplinary charges, including possible revocation of its pharmacy license, as well as the initiation of an enforcement action by HRC if the preliminary injunction is overturned.

The district court granted the motion of seven individuals to intervene pursuant to Federal Rule of Civil Procedure 24(a). These individuals (collectively, "Intervenors") are five women who have been refused Plan B and/or may need timely access to Plan B in the future, and two HIV-positive individuals who need timely access to prescribed medications to manage their illness.[7]

---

[7]Intervenors are: Judith Billings, Rhiannon Andreini, Jeffrey Schouten, Molly Harmon, Catherine Rosman, Emily Schmidt, and Tami Garrard.

In 2003, a pharmacist on duty at a Seattle pharmacy near the University of Washington refused to fill Molly Harmon's Plan B prescription. The

Plaintiffs moved for a preliminary injunction, asking that the court enjoin enforcement of the new rules against them pending litigation. On November 8, 2007, the district court issued an order granting a preliminary injunction based solely on plaintiffs' free exercise claim. *Stormans, Inc. v. Selecky*, 524 F. Supp. 2d 1245, 1266 (W.D. Wash. 2007). The court enjoined the State Defendants "from enforcing [Washington Administrative Code] §§ 246-863-095(4)(d) and 246-869-010(4)(d) (the anti-discrimination provisions) against any pharmacy which, or pharmacist who, refuses to dispense Plan B but instead immediately refers the patient either to the nearest source of Plan B or to a nearby source for Plan B." *Id.*[8]

---

pharmacist lectured Harmon about her choice of birth control. Though upset, Harmon insisted on speaking with the head pharmacist who ultimately dispensed the drug. In March 2007, Emily Schmidt was unable to obtain Plan B at two pharmacies in Wenatchee, Washington, because the pharmacy owner or pharmacist refused to dispense the drug. In November 2005, Rhiannon Andreini went to a pharmacy in Mukilteo, Washington, to purchase Plan B when her regular method of contraception failed. The pharmacist appeared to disapprove and stated that the store did not carry it. Andreini drove more than seventy miles back to her home to go to a pharmacy she knew would dispense the drug. Catherine Rosman, a case manager who assists women and adolescent girls suffering from domestic violence, is concerned that refusals to dispense Plan B will compound the trauma that her clients and thousands of girls and women like them will suffer as a result of sexual violence every year in Washington. Rosman has taken Plan B on two occasions, once following a sexual assault. In both instances, she chose to obtain the medication from Planned Parenthood because she heard several accounts of pharmacists refusing to dispense the drug or otherwise harassing patients.

Dr. Jeffrey Schouten, a Clinical Assistant Professor of Surgery at the University of Washington and a primary care physician at Washington's largest HIV-specialty clinic, and Judith Billings are HIV-positive. Dr. Schouten testified in favor of the new rules, explaining the importance of timely access to drugs for HIV-positive patients and individuals who have just been exposed to the virus. According to Dr. Schouten, because some people associate HIV status with certain lifestyle choices, these patients are at risk of pharmacy refusals and the serious health risks that accompany delayed access to needed medication.

[8]While the injunction refers only to the antidiscrimination provisions of the new rules, it appears the parties and district court understand that the injunction is intended to stop all enforcement actions under the new rules against any pharmacy or pharmacist refusing to dispense Plan B for whatever reason.

The State Defendants and the Intervenors timely appealed and asked the district court to stay the preliminary injunction pending appeal. Plaintiffs opposed the stay, but apparently recognizing that the injunction was overbroad, moved to modify the preliminary injunction, seeking to narrow its scope only to the named plaintiffs and their employees. The district court denied the motions.

On May 1, 2008, another panel of our court denied Intervenors' motion to stay the district court's injunction pending appeal. *Stormans Inc. v. Selecky*, 526 F.3d 406, 408 (9th Cir. 2008). Judge Tashima dissented from the denial of the stay. *Id.* at 409-18 (Tashima, J., dissenting in part).

## II.   JURISDICTION AND STANDARD OF REVIEW

The district court's jurisdiction is based on 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

The district court's grant of a preliminary injunction is reviewed for "abuse of discretion" and should be reversed if the district court based "its decision on an erroneous legal standard or on clearly erroneous findings of fact." *FTC v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1211-12 (9th Cir. 2004). "[W]e consider a finding of fact to be clearly erroneous if it is implausible in light of the record, viewed in its entirety, or if the record contains no evidence to support it." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005) (citations omitted). The district court's interpretation of the underlying legal principles, however, is subject to de novo review. *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 849 (9th Cir. 2009); *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1221 (9th Cir. 2003). Finally, because "[i]njunctive relief . . . must be tailored to remedy the specific harm alleged," *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991), "[a]n overbroad injunction is an abuse of discretion," *id.*

The district court's determination whether a party has standing is reviewed de novo. *See Buono v. Norton*, 371 F.3d 543, 546 (9th Cir. 2004). Ripeness is also a question of law reviewed de novo. *See Manufactured Home Cmtys. Inc. v. City of San Jose*, 420 F.3d 1022, 1025 (9th Cir. 2005). Questions of standing and ripeness may be raised and considered for the first time on appeal, including sua sponte. *See Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 850 (9th Cir. 2001) (en banc), *aff'd sub nom. Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003); *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 796-97 (9th Cir. 2001) (reviewing standing sua sponte even though not raised by either party).

## III.   DISCUSSION

### A.   Justiciability

Federal jurisdiction is limited to "actual 'cases' and 'controversies.' " *Allen v. Wright*, 468 U.S. 737, 750 (1984). We conclude that Appellees have standing to assert their claims under the Free Exercise Clause. Although their claims against the State Appellants are ripe for review, the claims they assert against HRC are not ripe for consideration and should be dismissed.

### 1.   Standing

**[1]** "Article III standing is a controlling element in the definition of a case or controversy." *Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 848 (9th Cir. 2007) (alteration and internal quotation marks omitted). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Intervenors argue that Stormans, a for-profit corporation, lacks standing to assert a claim under the Free Exercise Clause. We decline to decide whether a for-profit corporation can assert its own rights under the Free Exercise Clause and instead examine the rights at issue as those of the corporate owners.

In *First National Bank of Boston v. Bellotti*, the Supreme Court held that the "proper question" was "not whether corporations 'have' First Amendment rights and, if so, whether they are coextensive with those of natural persons." 435 U.S. 765, 776 (1978). "Instead, the question must be whether [the challenged statute] abridges [rights] that the First Amendment was meant to protect." *Id.* The Court refused to "address the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment." *Id.* at 777.

**[2]** We have held that a corporation has standing to assert the free exercise right of its owners. *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 620 n.15 (9th Cir. 1988). In *Townley*, a closely held manufacturing company whose owners made a covenant with God to run their business according to the principles of Christian faith, argued that under the Free Exercise Clause, they were entitled to an exemption from the requirement that employers accommodate employees asserting religious objections to devotional services. We reasoned that "[b]ecause Townley is merely the instrument through and by which Mr. and Mrs. Townley express their religious beliefs, it is unnecessary to address the abstract issue whether a for-profit corporation has rights under the Free Exercise Clause independent of those of its shareholders and officers." *Id.* at 619-20. We found that "Townley presents no rights of

its own different from or greater than its owners' rights" because the corporation is an "extension of the beliefs" of the owners, and "the beliefs of [the owners] are the beliefs and tenets of the Townley Company." *Id.* at 620 (internal quotation marks omitted). We therefore held that "Townley has standing to assert Jake and Helen Townley's Free Exercise rights," *id.* at 620 n.15, and examined the rights at issue as those of Jake and Helen Townley.

Here, Ken Stormans is the president, and his three children, including Kevin Stormans, serve as vice presidents of Stormans. Stormans asserts that because Ralph's is a fourth-generation, family-owned business whose shareholders and directors are made up entirely of members of the Stormans family, Kevin Stormans's opposition to Plan B is that of Ralph's and all the owners. In the amended complaint, Stormans alleges that Ralph's cannot sell Plan B "based on religious and moral grounds," and that Kevin "Stormans'[s] religious beliefs prevent him from selling a drug that intentionally terminates innocent human life." Stormans argues that Ralph's is an extension of the beliefs of members of the Stormans family, and that the beliefs of the Stormans family are the beliefs of Ralph's. Thus, Stormans, Inc. does not present any free exercise rights of its own different from or greater than its owners' rights. We hold that, as in *Townley*, Stormans has standing to assert the free exercise rights of its owners.[9]

---

[9]The Supreme Court has elsewhere considered the free exercise rights of business owners. *See, e.g.*, *United States v. Lee*, 455 U.S. 252 (1982) (considering the claim of an Amish employer seeking an exemption on his employees' behalf from the payment of social security taxes on religious grounds); *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) (considering the free exercise claim of nonprofit corporations operating religious schools affiliated with Christianity challenging a tax policy granting exemptions only to educational institutions that do not racially discriminate). Moreover, *Townley* also indicates that an organization that asserts the free exercise rights of its owners need not be primarily religious, as Townley's main function—manufacturing of mining equipment—was a secular activity.

**[3]** *Harris v. McRae*, 448 U.S. 297 (1980), is not to the contrary. In *Harris*, the Women's Division of a church, as an organization, sought to challenge a restriction on the use of federal funds for abortion. The Court held that because "the [Free Exercise] claim asserted here is one that ordinarily requires individual participation"—because a plaintiff must "show the coercive effect of the enactment as it operates against him in the practice of his religion"—and because members of the Women's Division had a "diversity of view[s]" concerning the law, the organization did not satisfy the requirements for associational standing. *Id.* at 321 (internal quotation marks omitted); *see also Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). But here, Stormans is not seeking relief as an organization and does not need to satisfy the requirements for associational standing. Thus, we will consider the rights of the owners as the basis for the Free Exercise claim.

**[4]** Stormans meets the standing criteria to pursue free exercise claims in this case. Its injuries are "concrete and particularized," "actual or imminent, not conjectural or hypothetical," and "fairly traceable" to the new rules. *See Friends of the Earth, Inc.*, 528 U.S. at 180. Because the new rules require the pharmacy to deliver medications, such as Plan B, in a timely manner, Stormans will not be able to avoid stocking Plan B on the basis of its religious objections. Its injuries will certainly be ameliorated should the new rules be held unconstitutional.

**[5]** The individual pharmacists, Mesler and Thelen, also enjoy standing to sue under the Free Exercise Clause.[10] The injuries suffered by Mesler and Thelen are "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *See id.* Mesler alleges that, without the court's

---

[10]Whether Mesler's and Thelen's claims under the Free Exercise Clause are meritorious is a question distinct from whether they have standing to sue. Intervenors confuse the two issues.

injunction, she expects to be fired because her religious convictions prohibit her from dispensing Plan B and her employer has told her that it will not be able to accommodate her. Thelen alleges she was forced to leave her former job (after her pharmacy was unable to hire a second pharmacist) to work at a pharmacy that accommodates her religious belief by ensuring that there is always another pharmacist on duty. Thelen has taken a job farther away from her house for less pay because her religious beliefs did not allow her to dispense Plan B.

**[6]** While indirect, there is a causal connection between the new rules and Mesler's threatened termination. Though "it does not suffice if the injury complained of is 'the result of the independent action of some third party not before the court,' that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (quoting *Lujan*, 504 U.S. at 560-61) (emphasis, alterations, citations, and internal quotation marks omitted). The new rules require a pharmacy to deliver medication in a timely manner—an act for which pharmacies generally depend upon their pharmacists. If certain pharmacists believe they cannot deliver certain medications and their employer is unable to accommodate this moral or religious belief, the pharmacy may not employ in the first place—and may terminate—the objecting pharmacists. Thus, if the new rules had not been passed, Mesler would not expect to lose her job and Thelen would not have been forced to find a new job. Furthermore, a favorable decision likely will redress the alleged injuries. If the new rules are invalidated, Mesler and Thelen will not be limited to employment only at pharmacies able to accommodate their religious views.

In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982). "[P]rudential standing

concerns require that we consider . . . whether the alleged injury is more than a mere generalized grievance, whether [plaintiffs] are asserting [their] own rights or the rights of third parties, and whether the claim falls within the zone of interests to be protected or regulated by the constitutional guarantee in question." *Alaska Right to Life Political Action Comm.*, 504 F.3d at 848-49 (internal quotation marks omitted).

**[7]** The prudential "zone of interest" test, as the Supreme Court has observed, is "not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). "Prudential standing is satisfied unless [the party's] 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that [the legislature] intended to permit the suit.' " *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 861 (9th Cir. 2005) (quoting *Clarke*, 479 U.S. at 399). Appellees also meet the prudential standing requirements. Appellees' conduct is directly regulated by the new rules and their constitutional interests are, according to the Appellees, directly infringed by the new rules. It is difficult to imagine a more appropriate group of plaintiffs to challenge new rules governing the conduct of pharmacies and pharmacists than a pharmacy and two pharmacists.

## 2. Ripeness

**[8]** "[R]ipeness is peculiarly a question of timing, designed to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' " *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)) (internal quotation marks omitted). "Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the

powers granted the judiciary in Article III of the Constitution." *Id.* Constitutional ripeness, in many cases, "coincides squarely with standing's injury in fact prong" and "can be characterized as standing on a timeline." *Id.*

**[9]** As detailed above, Appellees' injuries are "real and concrete rather than speculative and hypothetical." *Id.* at 1139 (internal quotation marks omitted). However, when a litigant brings a preenforcement challenge, we have found that "a generalized threat of prosecution" will not satisfy the ripeness requirement. *Id.* "Rather, there must be a genuine threat of imminent prosecution." *Id.* (internal quotation marks omitted). There are three factors we consider when analyzing the genuineness of a threat of prosecution: "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.*

In *Thomas*, landlords claimed that their pro-marriage religious beliefs prevented them from renting housing to unmarried couples and therefore would compel them to violate a law banning housing discrimination on the basis of marital status. We found that the claims were not ripe because the landlords had only a general " 'intent' to violate the law on some uncertain day in the future—if and when an unmarried couple attempts to lease one of their rental properties." *Id.* at 1140. The landlords could not even specify "when, to whom, where, or under what circumstances" "they have refused to rent to unmarried couples in the past." *Id.* at 1139. We held that "[a] general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan." *Id.*

**[10]** Here, by contrast, although Appellees cannot control when a patient requesting Plan B will visit their pharmacy—prompting a refusal constituting a violation of the new rules—

the Appellees can point to specific past instances when they have refused to sell Plan B or have made the decision not to stock the medication, which are direct violations of the challenged rules.

[11] Intervenors also contend that Mesler's and Thelen's claims are unripe because there has not been any state action threatening them and the new rules do not threaten them directly. However, the Board need not take any further action for individual pharmacists to be affected by the new rules; the very existence of the new rules may cause an employer to terminate a pharmacist who objects to dispensing a medication. Given the procedural posture of the case, and considering that the new rules became effective one day *after* the lawsuit was brought, the record with respect to Mesler and Thelen is sparse. We do not know whether Mesler's and Thelen's employers have been contacted by the Board; nor do we even know their employers' identity. Still, we conclude that their claims are ripe for review because as a result of the new rules and the guiding principles communicated by the Board, Thelen has been forced to leave her job, and Mesler is in danger of termination.

Until June 2007, Thelen served as a staff pharmacist in a Washington retail pharmacy and was the only pharmacist on duty during her work hours. She had informed her employer when hired that her religious beliefs would prevent her from dispensing Plan B. When customers requested Plan B, Thelen referred them to local pharmacies that she knew sold the drug. When she learned that the Board passed the new rules, but before they went into effect, Thelen contacted the Board to make sure she understood what the new rules would require. A member of the Board responded to her emails, and instructed her that she would not face discipline by refusing to dispense Plan B for moral or religious objections, but that her pharmacy would be subject to discipline "[i]f another pharmacist is not available or if the patient will not wait for the change of shift." According to Thelen, her "employer said

the company could not hire another pharmacist to work with [her] or to remain on call." "Because they could not accommodate [her] religious beliefs, [her] employer said it would not work for [her] to remain employed there." "Even though [she] absolutely loved [her] job and the fact that it allowed [her] to work in [her] local community," Thelen declares that she "was forced to find other employment." Because she could not find any pharmacy positions in her community and the new rules limited her employment opportunities, Thelen found work at a hospital pharmacy with a "much longer commute, less income and work hours," and less desirable work shifts that keep her away from her family until around 10 p.m. many nights.

Rhonda Mesler was hired by her current employer in November 2004. When she was hired, she told her supervisor that she objected to dispensing Plan B, and her employer agreed to accommodate her by not forcing her to dispense the drug. When a customer requested Plan B, Mesler referred them to nearby pharmacies. She is the only pharmacist on duty during her shift. After receiving a June 25, 2007, email from the Department of Health concerning the new rules that would go into effect on July 26, 2007, Mesler emailed her supervisor. She "asked how the store would handle [her] religious objection." Mesler's "employer . . . said that the company cannot afford to hire another pharmacist to work with [her]." Mesler thus "expect[s] to be fired from [her] position very soon."

In the amended complaint, Appellees seek a declaratory judgment, and a preliminary and permanent injunction. We determine whether a declaratory judgment action is ripe for adjudication by evaluating "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Although Mesler has not yet suf-

fered the consequences of the new rules, her employer has informed her that it will not be able to accommodate her refusal to dispense Plan B under them. She is at serious risk of losing her job because of these new rules. This risk is sufficiently real and immediate such that, assuming her claims have merit, a declaratory judgment or injunction is warranted. Thelen's claims are also ripe. Her employer told her "it would not work for [her] to remain employed there." She was forced to find another job. That job is less desirable to Thelen for many reasons. Thus, there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of declaratory and injunctive relief. If the rules are struck down, Thelen would not be limited to working only in those pharmacies that could accommodate her religious beliefs.

In addition to the State Appellants, Appellees sued HRC, the entity responsible for enforcing WLAD. Appellees base their challenge against HRC entirely on an April 17, 2006, letter sent to the Board by HRC's Executive Director while the rulemaking process was pending. The letter advised that it would be "illegal and bad policy to permit pharmacists to deny services to women based on the individual pharmacists' religious or moral beliefs." According to the letter, it is HRC's opinion that any pharmacy or pharmacist who declines to dispense Plan B for any reason engages in sex discrimination in violation of federal and state law, even if another on-site pharmacist filled the prescription. The district court relied on the views expressed in the April 2006 letter, the posting of the letter on HRC's website, and HRC's history in "aggressively pursu[ing] violators of the WLAD" to conclude that plaintiffs' claims against the HRC Appellants are ripe for judicial review. *Stormans*, 524 F. Supp. 2d at 1256.

We disagree. In *Alaska Right to Life Political Action Committee v. Feldman*, the executive director of the state Commission on Judicial Conduct issued a letter interpreting the Code of Judicial Conduct to require recusal of judges committed to a position on an issue that could come before the court. 504

F.3d at 846. A political action committee brought suit against, inter alia, members of the Commission, when judges refused to answer the committee's questionnaire regarding their views on abortion. We dismissed the suit on ripeness grounds, finding no threat of enforcement because the letter was written by a commission that had no enforcement power and that had never taken, and could never take, action against a judge because it was actually the duty of the state supreme court to discipline judges for violations of the Code. *Id.* at 850.

[12] Similarly, here, because no enforcement action against plaintiffs is concrete or imminent or even threatened, Appellees' claims against HRC are not ripe for review. First, HRC has no authority to enforce the Board rules and therefore cannot bring an enforcement action under the new rules or revoke a pharmacist's license. Second, while Appellees allege that HRC intends to charge pharmacies and pharmacists who refuse to dispense Plan B with sex discrimination under WLAD, HRC also lacks authority to discipline violations of WLAD or to issue penalties. As in *Alaska Right to Life*, the final determination of discrimination is made by an independent tribunal—in this case, an administrative law judge. *See* Wash. Rev. Code Ann. § 49.60.250. According to Brenman, HRC's Executive Director, HRC has received no complaints and has taken no action against any pharmacy or pharmacist for any conduct related to the new rules. Brenman has even declared that he did not intend his 2006 letter to be construed as a rule and that it cannot be understood as such. The Washington Supreme Court has held that "an agency's written expression of its interpretation of the law does not implement or enforce the law and is advisory only." *Wash. Educ. Ass'n v. Wash. State Pub. Disclosure Comm'n*, 80 P.3d 608, 611 (Wash. 2003) (en banc) (internal quotation marks omitted) (analyzing interpretive guidelines posted on agency website). Moreover, the April 2006 letter, written a year before the new rules were adopted, was not a specific warning to Appellees and binds no one. Even if the letter—which was not directed to Appellees or any other specified pharmacy or pharmacist—

could be construed to be a threat of enforcement, it is nothing more than a generalized threat.[11] Moreover, the Board has even *disagreed* with the letter by approving accommodations the letter identified as discriminatory, such as allowing a second pharmacist (or perhaps a pharmacy technician) to sell the drug.

The district court further erred by considering the history of HRC's enforcement of WLAD claims as evidence of a "history of past prosecution." In *Thomas*, we dismissed the landlords' claim on ripeness grounds because the defendant agency had never enforced the actual law challenged and had investigated only citizen complaints. 220 F.3d at 1141. HRC has never initiated an action against any pharmacist refusing to provide Plan B. Thus, how aggressively HRC generally enforces WLAD against claims of discrimination is irrelevant to examining whether HRC is specifically threatening to enforce WLAD against Appellees.

[13] HRC is authorized to comment on rules being considered by other agencies or state officials, and that is exactly what it did when it issued the April 2006 letter. Therefore, Appellees' claims against the HRC appellants are not ripe and they must be dismissed on remand.

Finally, we examine the issue of prudential ripeness. Though a concrete case or controversy is present, we also evaluate whether we should decline to exercise jurisdiction on the basis of two interrelated factors: "the fitness of the issues for judicial decision and the hardship to the parties of with-

---

[11]*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), which Appellees cite in support of their argument, does not suggest otherwise. In that case, the obscenity commission's notices were sent to specific companies listing particular books the commission wished to censor, with a warning of criminal prosecution. There were also subsequent visits by the police. The notices directly impaired sales. *Id.* at 62-64. Here, Appellees have not shown any injury from the issuance of the Brenman letter, which was addressed to the Board, not to any pharmacies or pharmacists.

holding court consideration." *Id.* (quoting *Abbott Labs.*, 387 U.S. at 149).

**[14]** "To meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999) (internal quotation marks omitted). We consider whether the "regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 783 (9th Cir. 2000) (internal quotation marks omitted). This factor is certainly met, because unless Appellees prevail in this litigation, they will suffer the very injury they assert—they will be required to dispense Plan B over their religious and moral objections.

**[15]** "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *US West Commc'ns*, 193 F.3d at 1118 (internal quotation marks omitted). We consider "whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Ass'n of Am. Med. Colls.*, 217 F.3d at 780. Although the new rules may undergo some amendment or agency construction, they currently have the force of law and would be binding on Appellees as written absent the existence of preliminary relief. There is no indication that these rules are anything other than a "definitive statement of an agency's position," "requir[ing] immediate compliance" by Appellees. This situation is unlike that in *Thomas*, in which the court held that "the landlords' claim rests upon hypothetical situations with hypothetical tenants," and, due to the lack of an "adequately developed factual record," was not ripe. 220 F.3d at 1142. Here, the record is

admittedly sparse, but the circumstances presented by Appellees are not hypothetical. If a patient enters their pharmacies requesting Plan B, which the record reflects has occurred, Appellees will refuse to deliver the medication. Whether this action would directly violate the new rules is a "primarily legal" inquiry. Because there are no incomplete hypotheticals or open factual questions akin to those in *Thomas*, *see id.* at 1142 n.8 (noting that it was unclear from the record, for example, "whether the landlords' view on appropriate tenants extends to female roommates"), we hold that despite the preliminary nature of the record, Appellees' claims satisfy the requirements of prudential standing.

## B.   Grant of Preliminary Injunction

When the district court applied the legal standard for granting a preliminary injunction, it did not have the benefit of the Supreme Court's decision in *Winter v. Natural Res. Def. Council, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 374 (2008). As a result, the district court applied the legal standard subsequently rejected by the Supreme Court in *Winter* as "too lenient." *Id.* at 375.

**[16]** Before *Winter* was decided, we had held that to prevail on a motion for preliminary injunction, the plaintiff must demonstrate:

> either: (1) a likelihood of success on the merits and the *possibility* of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be shown.

*See, e.g.*, *Clear Channel Outdoor Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003) (emphasis added and alterations

and internal quotation marks omitted). In *Winter*, the Supreme Court definitively refuted our "possibility of irreparable injury" standard, stating "the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 129 S. Ct. at 375. The Court instructed that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 375-76 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

**[17]** Applying *Winter*, we have since held that, "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (footnote omitted). Thus, the district court's appropriate application of our pre-*Winter* approach in granting relief is now error. The proper legal standard for preliminary injunctive relief requires a party to demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 129 S. Ct. at 374.

### 1.  Likelihood of Success on the Merits

The district court held that Appellees demonstrated "a likelihood of success on the merits" of their Free Exercise claim. Because this holding was based on the district court's findings that the new rules are not neutral and generally applicable, which in turn triggered application of the strict scrutiny standard of review, it was in error. Thus, the district court's conclusion that the new rules fail strict scrutiny review because they were neither justified by a compelling interest nor narrowly tailored constitutes an abuse of discretion. *Stormans*, 524 F. Supp. 2d at 1264.

### (a)  Free Exercise Challenge

**[18]** The Free Exercise Clause, applicable to the states through the Fourteenth Amendment, *Cantwell v. State of Conn.* 310 U.S. 296, 303 (1940), provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]," U.S. Const., amend. I. The right to freely exercise one's religion, however, "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (quoting United States v. Lee, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)). Under the governing standard, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

Underlying the Supreme Court's jurisprudence is the principle that the Free Exercise Clause "embraces two concepts[ ] —freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct

remains subject to regulation for the protection of society. *Cantwell*, 310 U.S. at 303—04. This principle traces its roots to the idea that allowing individual exceptions based on religious beliefs from laws governing general practices "would . . . make the professed doctrines of religious belief superior to the law of the land, and in effect [ ] permit every citizen to become a law unto himself." *Reynolds v. United States*, 98 U.S. 145, 167 (1878). The *Smith* Court explained that it is

> [p]recisely because we are a cosmopolitan nation made up of people of almost every conceivable religious preference, and precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming *presumptively invalid*, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order.

494 U.S. at 888 (citation and internal quotation marks omitted). Such a presumption would have wide-ranging and injurious effects on our society, as exemptions could be mandated from "compulsory military service, . . . payment of taxes, . . . health and safety regulation such as manslaughter and child neglect laws, compulsory vaccination laws, drug laws, and traffic laws, [and] social welfare legislation such as minimum wage laws, child labor laws, animal cruelty laws, environmental protection laws, and laws providing for equality of opportunity." Id. at 889 (citations omitted).

The principles enunciated by the Court in *Smith* and *Lukumi* thus flow from the Court's free exercise jurisprudence. In its first case addressing the Free Exercise Clause, the Court held that congressional legislation prohibiting the practice of polygamy was constitutional, and that those who made polygamy part of their religious practice, such as members of the Mormon Church at the time, were not excepted from the statute's operation. *See Reynolds*, 98 U.S. at 166. The Court explained that Congress was "free to reach actions

which were in violation of social duties or subversive of good order," *id.* at 164, because "[l]aws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices," *id.* at 166.

The Court focused on the distinction between belief and conduct again in *Cantwell*, 310 U.S. at 303—04, when it invalidated a state statute requiring a license for religious solicitation because the officer would have had to determine, as a condition for the license, whether the applicant had a religious belief. The Court explained that if the law had been a "general regulation" of conduct that did "not involve any religious test," it would not have been "open to any constitutional objection." *Id.* at 305. In a subsequent case, the Court concluded that requiring public school children to salute the flag as part of a daily school exercise did not violate the Free Exercise Clause because "[c]onscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs." *Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 594 (1940), *overruled on other grounds by W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). It emphasized that "[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." *Id.* at 594—95.

The Supreme Court continued to uphold the constitutionality of such "general law[s] not aimed at the promotion or restriction of religious beliefs." *Id.* at 594. In *Prince v. Massachusetts*, 321 U.S. 158 (1944), the Court found that a mother could be prosecuted pursuant to child labor laws when she used her Jehovah's Witnesses children to dispense religious literature in the streets. The state was permitted to prevent these children "from doing there what no other children may do." *Id.* at 171. In *Braunfeld v. Brown*, 366 U.S. 599 (1961),

the Court upheld a law that prohibited retail sales on Sunday. Orthodox Jews challenged the law because they already closed their businesses on Saturdays for religious reasons, and claimed that to close their business on Sunday as well would result in economic hardship and thus interfere with the free exercise of their religion. The Court found that the law "simply regulate[d] a secular activity" and declined to find the law invalid. *Id.* at 605.

The Court articulated the current governing standard—that a neutral law of general applicability will not be subject to strict scrutiny review—in *Smith* and *Lukumi*. In *Smith*, the plaintiff was fired from his job after using peyote for sacramental purposes. Peyote use violated state law, and, as a result, Smith was denied unemployment compensation. *Smith*, 494 U.S. at 874. Although the Court confirmed that the government may not regulate religious beliefs, it stated that it has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Id.* at 878—79. The Court thus held that because Oregon's prohibition on peyote use is constitutional, and Smith's dismissal resulted from illegal peyote use, it was permissible to deny Smith unemployment compensation. *Id.* at 890.

The Court held that neutral and generally applicable statutes that regulate conduct are not required to pass strict scrutiny review, thus limiting the viability of *Sherbert v. Verner*, 374 U.S. 398 (1963), which previously had applied the compelling interest test to governmental denial of unemployment compensation. The Court reasoned that while "[t]he 'compelling government interest' requirement seems benign[ and] familiar" from cases analyzing race discrimination and content regulation of speech, it is unsuitable for the free exercise context. *Smith*, 494 U.S. at 885—86. "What it produces in those other fields—equality of treatment and an unrestricted flow of contending speech—are constitutional norms; what it would produce here—a private right to ignore generally appli-

cable laws—is a constitutional anomaly." *Id.* at 886. The Court concluded that it would "contradict[ ] both constitutional tradition and common sense" to make a person's obligation to obey a generally applicable neutral law "contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling.' " *Id.* at 885.

**[19]** In *Lukumi*, the Court reiterated "the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." 508 U.S. at 531. However, "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny," *id.* at 546, and is "invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest," *id.* at 533. As the district court correctly recognized, *Smith* and *Lukumi* govern this case. To determine whether rational basis review or strict scrutiny applies, we must first decide whether the new rules are neutral and generally applicable. Though "[n]eutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied," *id.* at 531, we consider each of the two criteria in turn. We must evaluate the text of the challenged law as well as its "effect . . . in its real operation." *Id.* at 535.

### (I)   Neutrality

**[20]** "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533. "There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct." *Id.* The *Lukumi* court considered both the text and the operation of the ordinance at issue. *Id.* at 533—540. We employ the same analysis in determining that the rules are neutral.

### i. Facial Neutrality

**[21]** "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.* at 533. In its textual analysis, the *Lukumi* court asked whether the ordinance was facially neutral. *Id.* at 533 ("[T]he minimum requirement of neutrality is that a law not discriminate on its face."). Applying the *Lukumi* analysis to the plain text of the ordinances, the district court correctly concluded that the new rules are facially neutral. *See Stormans*, 524 F. Supp. 2d at 1257. The new rules make no reference to any religious practice, conduct, or motivation.

### ii. The Rule's Operation

"Apart from the text, the effect of a law in its real operation is strong evidence of its object." *Lukumi*, 508 U.S. at 535. In its operational analysis, the *Lukumi* court assessed the design of the ordinance and asked whether it was over- or under-inclusive relative to its stated object. *See id.* at 535 ("The design of these laws accomplishes instead a 'religious gerrymander' . . . , an impermissible attempt to target petitioners and their religious practices."). The Court determined that the ordinances at issue were underinclusive in their effect where "the burden of the ordinance, in practical terms, falls on Santeria adherents but almost no others." *Id.* at 536. The ordinance was "careful[ly] draft[ed] to ensure[ ] that, although Santeria sacrifice is prohibited, killings that are no more necessary or humane in almost all other circumstances are unpunished." *Id.* at 536. The *Lukumi* court also found the ordinance at issue to be overinclusive where it "prohibit[ed] Santeria sacrifice even when it does not threaten the city's interest in the public health." *Id.* at 538—39. For example, the city banned ritual sacrifices of animals when "regulation of conditions and treatment, regardless of why an animal is kept, is the logical response to the city's concern [for the adequate care of animals]." *Id.* at 538.

**[22]** Unlike the ordinance at issue in *Lukumi*, the new rules operate neutrally. They do not suppress, target, or single out the practice of any religion because of religious content. The evidentiary record—though thin given the procedural posture of this case—sufficiently reflects that the object of the rules was to ensure safe and timely patient access to lawful and lawfully prescribed medications. As such, the new rules eliminate all objections that do not ensure patient health, safety, and access to medication. They require delivery of all lawfully prescribed medications, save for when one of several narrow exemptions permits refusal. Thus, aside from the exemptions, any refusal to dispense a medication violates the rules, and this is so regardless of whether the refusal is motivated by religion, morals, conscience, ethics, discriminatory prejudices, or personal distaste for a patient.

**[23]** That the rules may affect pharmacists who object to Plan B for religious reasons does not undermine the neutrality of the rules. The Free Exercise Clause is not violated even though a group motivated by religious reasons may be more likely to engage in the proscribed conduct. *See Reynolds*, 98 U.S. at 166—67 (upholding a polygamy ban though the practice is followed primarily by members of the Mormon church); *cf. United States v. O'Brien*, 391 U.S. 367 (1968) (rejecting a First Amendment challenge to a statutory prohibition of the destruction of draft cards though most violators likely would be opponents of war). The Fourth Circuit's decision in *American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir. 1995), is instructive. The *Reno* court upheld the Freedom of Access to Clinic Entrance Act, which established criminal penalties and civil remedies for certain conduct intended to injure, intimidate, or interfere with persons seeking to obtain or provide reproductive health services. *Id.* at 656. The court found no free exercise violation—even though it acknowledged that Congress passed the law in response to anti-abortion protests—because it recognized that the Act "punishe[d] conduct for the harm it causes, not because the conduct is religiously motivated." *Id.* at 654; *see also Vision*

*Church v. Vill. of Long Grove*, 468 F.3d 975, 999 (7th Cir. 2006) (finding no free exercise violation even if a zoning ordinance targeted a proposed plan for a new church because the commission was concerned about the nonreligious effect of the church on the community); *Knights of Columbus, Council No. 94 v. Town of Lexington*, 272 F.3d 25, 35 (1st Cir. 2001) (finding no free exercise violation although a regulation limiting displays on the town green was adopted in response to a flood of religious groups seeking to erect displays). Thus, the district court erred in finding that "the object of the regulations is to eliminate from the practice of pharmacy . . . those pharmacists who, for religious reasons, object to the delivery of lawful medications, specifically Plan B." *Stormans*, 524 F. Supp. 2d at 1258. The neutrality of the new rules is not destroyed by the possibility that pharmacists with religious objections to Plan B will disproportionately require accommodation under the rules.

### iii.   Legislative History

In addition to the text and operation of the new rules, the district court considered something that the Lukumi majority did not—the historical background of the ordinances. It is unclear whether the district court was permitted to undertake this analysis. While the analysis of legislative history is proper in the equal protection context, the law is unsettled regarding the scope of its consideration in the free exercise arena.

That the law is unclear on this point is evident from the *Lukumi* Court's splintering on this issue. Analysis of legislative history was sanctioned as part of the free exercise analysis only in Justice Kennedy's nonprecedential Part II.A.2, which was joined only by Justice Stevens.[12] *Lukumi*, 508 U.S.

---

[12]Though the district court did not actually cite Part II.A.2 of *Lukumi*, it quoted Justice Kennedy's historical analysis verbatim. *Compare Stormans*, 524 F. Supp. 2d at 1258, *with Lukumi*, 508 U.S. at 540 (Kennedy, J., joined by Stevens, J.).

at 540—42 (Kennedy, J., joined by Stevens, J.). Meanwhile, Chief Justice Rehnquist and Justices Scalia and Thomas joined all but that portion of the opinion because, in their view, such an inquiry was inappropriate in the free exercise context. *See id.* at 558 (Scalia, J., concurring in part and concurring in the judgment) ("I do not join [Part II.A.2] because it departs from the opinion's general focus on the object of the *laws* at issue to consider the subjective motivation of the *lawmakers* . . . . As . . . noted elsewhere, it is virtually impossible to determine the singular motive of a collective legislative body." (internal quotation marks omitted)). Justice Scalia, the author of the *Smith* opinion, explained that the Free Exercise Clause "does not refer to the purposes for which legislators enact laws, but to the effects of the laws enacted." *Id.*

We may discern with certainty only that Chief Justice Rehnquist and Justice Scalia did not join Part II.A.2 of the opinion due to disagreement with Justice Kennedy's use of legislative history. Justices Souter, Blackmun, and O'Connor disagreed with *Smith*'s holding and may have agreed with Justice Kennedy's approach. *See Lukumi*, 508 U.S. at 559 (Souter, J., concurring in part and concurring in the judgment) (declining to join Part II because of concerns "about whether the *Smith* rule merits adherence"). Justice White joined all but Part II.A of the opinion. Justice Blackmun filed an opinion concurring in the judgment, in which Justice O'Connor joined, explaining that he "continue[s] to believe that *Smith* was wrongly decided," and "while [he] agree[s] with the result the Court reaches in this case, [he] arrive[s] at that result by a different route." *Id.* at 578 (Blackmun, J., concurring in the judgment). Therefore, the Supreme Court in *Lukumi* left open the question of whether it is appropriate to consider legislative history as part of a Free Exercise Clause analysis.[13]

---

[13]In the only Free Exercise case decided by the Supreme Court since *Lukumi*, *Locke v. Davey*, 540 U.S. 712 (2004), the Court did not resolve

Cases within our Circuit do not offer meaningful guidance on the unsettled question of whether courts may examine legislative history in determining whether a challenged law violates the Free Exercise Clause's neutrality requirement. For example, in *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024 (9th Cir. 2004), we expressed a lack of concern with the district court's citation of an opinion of our court discussing the Equal Protection Clause because "[t]he Supreme Court has approved reference to equal protection jurisprudence . . . '[i]n determining if the object of a law is a neutral one under the Free Exercise Clause.' " *Id.* at 1030 n.4 (quoting *Lukumi*, 508 U.S. at 540). We neither elaborated on that statement nor examined the historical or legislative background of the challenged ordinance in reaching our conclusion that the ordinance at issue was generally applicable and neutral. *See id.* at 1032 ("[T]here is not even a hint that College was targeted on the basis of religion . . . ."). In *KDM v. Reedsport School District*, 196 F.3d 1046, 1048 (9th Cir. 1999), a disabled student challenged a state law which provided special education services to students in private secular schools, but not to students in private sectarian schools. Although we stated that "evidence of a substantial animus that motivated the law in question" could distinguish *Lukumi*, *id.* at 1051 (internal quotation marks omitted), we held that "there [was] no showing that application of the regulation to KDM's case burdens KDM's or his parents' free exercise of their religion," *id.* at 1050.

---

this question. In *Locke*, a majority of the Court held that a Washington publicly funded scholarship program which excluded students pursuing a "degree in theology" did not violate the Free Exercise Clause. *Id.* at 725. In reaching this conclusion the Court stated, "[W]e find neither in the history or text of . . . the Washington Constitution, nor in the operation of the [challenged law], anything that suggests animus toward religion." *Id.* While the Court considered the "history" of the state constitution, it did not consider the history of the challenged law itself. Therefore, *Locke* does not shed any light on the question of whether it is permissible to consider the legislative history of the challenged law in a Free Exercise Clause analysis.

Nor do cases from our sister circuits aid us in determining whether legislative history may be appropriately considered in the neutrality analysis. These cases serve only to illustrate that the issue is unsettled. *Compare St. John's United Church v. City of Chicago*, 502 F.3d 616, 633 (7th Cir. 2007) (stating that it is appropriate to consider legislative history when determining neutrality), *Wirzburger v. Galvin*, 412 F.3d 271, 281 (1st Cir. 2005) (considering "evidence of animus against Catholics in Massachusetts in 1855 when the [challenged law] was passed"), *and Prater v. City of Burnside*, 289 F.3d 417, 429 (6th Cir. 2002) (primarily analyzing the law's effect in operation, but also considering "the manner in which the City rejected its proposed alternative" to the challenged law), *with Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1234 n.16 (11th Cir. 2004) ("Under *Lukumi*, it is unnecessary to identify an invidious intent in enacting a law . . . .").

We need not decide whether it was permissible for the district court to rely upon the administrative history of the new rules because that history provides no meaningful guidance on the object or neutrality of the final rules adopted by the Board. While the Board's deliberative process may have been initiated over concerns regarding Plan B, the administrative history hardly reveals a single design to burden religious practice; rather, it is a patchwork quilt of concerns, ideas, and motivations. The record reveals that the draft rules morphed and evolved throughout the deliberative process, as did the concerns raised both by rulemakers and the public participants. The collective will of the Board cannot be known, except as it is expressed in the text and associated notes and comments of the final rules. To the extent the record indicates anything about the Board's motivation in adopting the final rules, it shows the Board was motivated by concerns about the potential deleterious effect on public health that would result from allowing pharmacists to refuse to dispense lawfully prescribed medications based on personal, moral objections (of which religious objections are a subset). It would, therefore, be incorrect to impute—as the district court did—to the entire

Board a motivation to "impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543.

**[24]** Therefore, regardless of the proper role of legislative history in a Free Exercise Clause analysis—which, as discussed, remains unclear—the district court erroneously relied upon it because it reveals little about the Board's motivation in adopting the rules, and, to the extent it does reveal anything, it indicates that the Board's concern was to promote the public welfare, not to burden religious belief.

### (II)  General Applicability

**[25]** A law is not generally applicable when the government, "in a selective manner[,] impose[s] burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. The "selective manner" analysis tests the rules for substantial underinclusiveness. For example, the *Lukumi* Court concluded that the challenged ordinances were not of general applicability because "each of Hialeah's ordinances pursues the city's governmental interests only against conduct motivated by religious belief." *Id.* at 545. Because the ordinances "fail[ed] to prohibit nonreligious conduct that endanger[ed] these interests in a similar or greater degree than Santeria sacrifice does," *id.* at 543, it was religion, and religion alone, that bore the burden of the ordinances, giving the ordinances the "appearance of a prohibition that society is prepared to impose upon [Santeria worshippers] but not upon itself," *id.* at 545 (alteration in original) (citations and internal quotation marks omitted). According to the Court, "[t]his precise evil is what the requirement of general applicability is designed to prevent." *Id.* at 545—46. Thus, it was the ordinances' substantial underinclusiveness with respect to the city's supposed interests in protecting the public health and preventing cruelty to animals that led to the Court's conclusion that the ordinances were not generally applicable.

**[26]** Instead of analyzing whether the new rules were substantially underinclusive, the district court decided that it

should "examine the law's means and the law's ends: if the means fail to match the ends, the statute likely targets religious conduct and is therefore not generally applicable." *Stormans*, 524 F. Supp. 2d at 1260. It held that the new rules "do not appear to the Court to be of general application" because "[t]he evidence now before the Court convinces it that the 'means' used by the rulemakers do not square with the 'end' currently espoused by the defendants." *Id.* at 1263. By adopting a means/ends test instead of the *Lukumi* underinclusiveness analysis, the district court committed legal error. The means/ends test is, in essence, a version of intermediate scrutiny under which a regulation must be substantially related to an important governmental objective. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 197 (1976). The district court thus applied a level of scrutiny that runs contrary to the rule of *Smith* and *Lukumi*.

**[27]** Utilizing the correct legal standard, the new rules are generally applicable because they are not substantially underinclusive. There is no evidence that State Appellants pursued their interests only against conduct with a religious motivation. Under the rules, all pharmacies have a "duty to deliver" all medications "in a timely manner." Neither regulation challenged in this case applies to refusals only for religious reasons. The new rules apply to all lawful medications, not just those that pharmacies or pharmacists may oppose for religious reasons. Pharmacies and pharmacists who do not have a religious objection to Plan B must comply with the rules to the same extent—no more and no less—than pharmacies and pharmacists who may have a religious objection to Plan B. Therefore, the rules are generally applicable.

The narrow class of exemptions—necessary reasons for failing to fill a prescription—does not impair the general applicability of the rules. These provisions exempt a pharmacy from its comprehensive duty to deliver medications in certain enumerated situations, such as when a state of emergency is declared, a prescription is potentially fraudulent or

erroneous, or the patient cannot pay. Wash. Admin. Code §§ 246-869-010(1)(a)—(e), (2).[14] The district court acknowledged that these exemptions "all reflect legitimate, time-honored reasons for not filling a prescription." *Stormans*, 524 F. Supp. 2d at 1262. Nonetheless, it concluded that because the new rules do not mandate delivery of all medications under all circumstances, the rules do not actually further access to medications. *Id.*

The district court's reasoning is unpersuasive. How much the new rules actually increase access to medications depends on how many people are able to get medication that they might previously have been denied based on religious or general moral opposition by a pharmacist or pharmacy to the given medication. Whatever that number, it will not be smaller than the number of pharmacists or pharmacies affected by the regulation, so it cannot be shrugged off as insignificant.

The existing exemptions are narrow. Nobody could seriously question a refusal to fill a prescription because the customer did not pay for it, the pharmacist had a legitimate belief that it was fraudulent, or supplies were exhausted or subject to controls in times of declared emergencies. Nor can every single pharmacy be required to stock every single medication that might possibly be prescribed, or to maintain specialized equipment that might be necessary to prepare and dispense every one of the most recently developed drugs. Instead of increasing safe and legal access to medications, the absence of these exemptions would likely drive pharmacies out of business or, even more absurdly, mandate unsafe practices. Therefore, the exemptions actually increase access to medications by making it possible for pharmacies to comply with the rules, further patient safety, and maintain their business.

That the pharmacy regulations recognize some exceptions cannot mean that the Board has to grant all other requests for

---

[14]*See supra* note 5 (listing exemptions).

exemption to preserve the "general applicability" of the regulations. There is no claim that the existing regulation recognizing these exceptions has not been fairly applied or that it will not be fairly and evenly applied in the future. These exemptions are a reasonable part of the regulation of pharmacy practice, and their inclusion in the statute does not undermine the general applicability of the new rules.

The text of the new rules itself suggests that their objective was to increase access to all lawfully prescribed medications, including Plan B. According to the survey cited by the district court, 23 percent of the pharmacies in the state do not carry Plan B, amounting to 315 pharmacies throughout the state. Moreover, even among the pharmacies that carry the drug, it is unclear how many pharmacists refuse to dispense it. Based on the sparse record before it, the district court erred in finding that access to Plan B was not a problem, especially given that state officials have already made findings suggesting the opposite.[15] *See* Final Significant Analysis for Rule Concerning Pharmacists' Professional Responsibilities, WAC 246-863-095 & Pharmacies' Responsibilities, WAC 246-869-010.

The district court also erred in finding that the Board has "chosen [to rely] on state and federal antidiscrimination laws to define when refusal to dispense is or is not allowed." *Stormans*, 524 F. Supp. 2d *at 1262*. The district court found this "choice of weapons" suspicious and concluded that because the antidiscrimination provisions prohibit only certain refusals

---

[15]The district court's reliance on "[t]he fact that the Pharmacy Board initially proposed a draft rule permitting a pharmacist/pharmacy to not fill a lawful prescription for reasons of conscience" as "further evidence" that access to Plan B was not a problem was also clearly erroneous. *See Stormans*, 524 F. Supp. 2d at 1261. The first draft rule proposed by the Board would have allowed a pharmacist to refuse to fill a lawful prescription only if another pharmacist onsite would dispense the medication without delay. This rule does not support the district court's conclusion that access to Plan B was not an issue. Moreover, *Lukumi* teaches us that we must review the rules as adopted, not in their prior versions.

and do not "require pharmacies or pharmacists to dispense lawful medications without delay every time they are requested," the rules are underinclusive and therefore not generally applicable. *Id.* The district court's finding is not supported by the record. The new rules, as any other rule promulgated by the Board, will be enforced by the Board pursuant to Washington Revised Code Annotated section 18.64.165, which permits the Board to "refuse, suspend, or revoke [a pharmacy's or pharmacist's] license" when "[t]he licensee . . . has violated any of the rules and regulations of the board of pharmacy." While the new rules prohibit discrimination against patients in a manner already prohibited by state or federal laws, they also require pharmacies to deliver lawfully prescribed and approved drugs in a timely manner, and mandate stocking of drugs to serve the needs of the community. In contrast, the HRC is in charge of compliance with WLAD and is authorized to recommend action to other officials in response to possible violations of WLAD. WLAD is a comprehensive but general antidiscrimination law—"an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights." Wash. Rev. Code Ann. § 49.60.010. WLAD does not "define when refusal to dispense is or is not allowed." *Stormans*, 524 F. Supp. 2d at 1262. Thus, WLAD is decidedly not the enforcement mechanism of the new rules.

Pharmacies were already subject to antidiscrimination laws as places of public accommodation. Wash. Rev. Code Ann. § 49.60.215. The antidiscrimination subsections of the new rules reiterate that antidiscrimination laws forbid pharmacies or pharmacists from discriminating against protected groups. They are not limited to refusals to dispense or distribute certain medications. For example, the antidiscrimination subsections would prohibit a pharmacist from filling all lawful prescriptions for, but requiring additional payment from, persons of a particular race or ethnic group, or refusing to accept personal checks only from persons with a disability.

Antidiscrimination laws also prohibit a pharmacy or a pharmacist from refusing to dispense a drug because of a personal animus or objection to a patient based upon that patient's membership in a protected class.

**[28]** As a corollary, the Board's rules regulate the practice of pharmacy, primarily by requiring pharmacies to deliver lawfully prescribed and approved drugs in a timely manner. The rules do not equate a pharmacist's refusal to dispense a drug because of a religious objection to the drug with a pharmacist's discrimination against a patient in a manner prohibited by state or federal law. Further, a pharmacy could violate the new rules by not stocking Plan B despite community demand even if, in doing so, it was not violating any state or federal antidiscrimination laws. Thus, the district court's finding that the Board relies on antidiscrimination laws to determine which refusals to deliver medication are and are not lawful was incorrect. Therefore, the court clearly erred in concluding that the challenged rules are underinclusive and not generally applicable.

The district court failed to give proper weight to the rules' distinction between pharmacies and pharmacists. The rules do not prohibit individual pharmacists from refusing to dispense a medication for religious reasons. A pharmacist may refuse to dispense Plan B on a religious ground because ultimately it is the duty of the pharmacy, not the pharmacist, to "deliver lawfully prescribed drugs." *Compare* Wash. Admin. Code § 246-869-010 (governing pharmacies), *with id.* § 246-863-095 (governing pharmacists). The district court found that accommodation of objecting pharmacists was too burdensome on the pharmacy because the *only* method of accommodation available is the hiring of another pharmacist to work side-by-side with the objecting pharmacist. *Id.* at 1256; *see also id.* at 1253 (stating the rules allow for only a "narrow right of conscience . . . if the pharmacist worked with another pharmacist on shift who would dispense the medication in place of the conscientious objector"). But this finding is contrary to the

evidence. The record demonstrates that several different methods of accommodation are available. For example, the Board itself stated, in a post-adoption letter to pharmacists and pharmacy owners, that for females eighteen and over, "[a] pharmacy technician can sell Plan B as an over-the-counter product, but the pharmacist must be available to provide the patient with consultation and advice if requested." It may also be sufficient to have a second pharmacist available by telephone if the onsite pharmacist objects to dispensing a medication or providing a requested consultation. Thus, the rules do not selectively impose an undue obligation on conduct motivated by religious belief because the rules actually provide for religious accommodation—an individual pharmacist can decide whether to dispense a particular medication based on his religious beliefs and a particular pharmacy may continue to employ that pharmacist by making appropriate accommodations.

#### (b)   Application of Rational Basis Review

**[29]** Because the rules are neutral and generally applicable, the district court should have subjected the rules to the rational basis standard of review. The district court instead introduced a heightened scrutiny to a neutral law of general applicability, contrary to the rule of *Smith* and *Lukumi*. When a law is neutral and generally applicable, the rational basis test applies. *See Miller v. Reed*, 176 F.3d 1202, 1206—07 (9th Cir. 1999) (holding that a regulation requiring the use of a social security number to obtain a driver's license survives rational basis review on a free exercise challenge). Under rational basis review, the rules will be upheld if they are rationally related to a legitimate governmental purpose. *See Gadda v. State Bar of Cal.*, 511 F.3d 933, 938 (9th Cir. 2007). To invalidate a law reviewed under this standard, "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (alteration in original) (internal quotation marks omitted). The record before us does

not suggest that Appellees have negated every conceivable basis supporting the new rules, so it appears that the new rules are rationally related to Washington's legitimate interest in ensuring that its citizen-patients receive lawfully prescribed medications without delay.

**[30]** The district court, however, has not yet had the opportunity to analyze or to make the appropriate factual findings as to whether the new rules are rationally related to a legitimate governmental purpose. Whether the rules pass muster under the rational basis test must be determined by the district court in the first instance.

## 2.    Balance of Hardships

To qualify for injunctive relief, the plaintiffs must establish that "the balance of equities tips in [their] favor." *Winter*, 129 S. Ct. at 374. In assessing whether the plaintiffs have met this burden, the district court has a "duty . . . to balance the interests of all parties and weigh the damage to each." *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Without discussion or analysis, the district court found that "[t]he facts presented show, to the Court's satisfaction, . . . the possibility of irreparable injury." *Stormans*, 524 F. Supp. 2d at 1264. As discussed above, however, the correct standard is not whether there is a "possibility" but whether there is a "likelihood of irreparable injury." *Winter*, 129 S. Ct. at 375. Given that the district court applied the incorrect pre-*Winter* legal standard for granting injunctive relief and that it applied a strict scrutiny standard of review, the district court must reweigh the balance of hardships among the parties and reconsider the interests at stake.

In reweighing the harms, the district court should focus on the harms to the individual Appellees and the Intervenors. The alleged injury to the Appellees is interference with their constitutional right of free exercise of their religion. Though "[b]y bringing a colorable First Amendment claim, [the

movant] certainly raises the specter of irreparable injury," "simply raising a serious [First Amendment] claim is not enough to tip the hardship scales." *Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1012 (9th Cir. 2007). If Appellees are compelled to stock and distribute Plan B without the benefit of the preliminary injunction, and a trial on the merits shows that such compulsion violates their constitutional rights, Appellees will have suffered irreparable injury, since "[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages."[16] *See Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008). Even if Thelen and Mesler leave their jobs or Stormans closes the pharmacy, they will not necessarily avoid constitutional injury. *See id.* ("[T]he loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages.").

There are also several possible harms to Intervenors since an injunction against enforcement of the new rules places the Intervenors at risk that the dispensing of Plan B will be delayed or denied. Some of these threatened harms to Intervenors may be mitigated by limiting the scope of the injunction. The district court must determine the likelihood that these harms will occur and weigh any harm likely to be suffered by the Intervenors if the injunction is granted against the injury that will likely befall the Appellees if it is not.

### 3.   Public Interest

The district court also failed to weigh in its analysis the

---

[16]If Appellees' injury was primarily financial, the balance would not tip to Appellees, because the injury would not be considered irreparable. *See L.A. Mem'l Coliseum Comm'n*, 634 F.2d at 1202 (9th Cir. 1980); *see also Braunfeld*, 366 U.S. at 606 (rejecting a challenge to a regulation that "may well result in some financial sacrifice in order to observe [appellants'] religious beliefs").

public interest implicated by the injunction, as *Winter* now requires. *See* 129 S. Ct. at 374. When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be "at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction." *See Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir. 2003). If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction. *See Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002) (" 'In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff.' ") (alteration omitted) (quoting *Fund for Animals v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992)); *see also Golden Gate Rest. Ass'n v. City & County of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008). "[When] an injunction is asked which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 —13 (1982). In fact, "courts . . . should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 312.

In this case, the overbreadth of the district court's injunction implicates the public interest. The district court did not merely enjoin enforcement of the Washington regulations against the plaintiffs, as it should have, *see infra* Part III.B.4. Rather, it purported to enjoin the enforcement of the regulations against "any pharmacy . . . or pharmacist who, refuses to dispense Plan . . ." *See Stormans*, 524 F. Supp. 2d at 1266. The injunction clearly reached non-parties and implicated issues of broader public concern that could have public consequences.

Even if the district court had limited the application of the injunction to the named Appellees, the public interest is still

a necessary consideration given the facts of this case. The "general public has an interest in the health" of state residents. *See Golden Gate Rest. Ass'n*, 512 F.3d at 1126. There is a general public interest in ensuring that all citizens have timely access to lawfully prescribed medications. With regard to Plan B, it may be in the public interest to deny the injunction to the extent that it is likely that sexually active women of childbearing age will be denied reasonable access to Plan B. Likewise, the injunction may not be in the public interest if it would likely cause unreasonable delay to a woman's ability to acquire and use the drug, where such delay may render the drug ineffective in preventing an unwanted pregnancy.

There may be additional evidence showing the public's interest in the grant or denial of the injunctive relief in this case. The plaintiffs bear the initial burden of showing that the injunction is in the public interest. *See Winter*, 129 S. Ct. at 378. However, the district court need not consider public consequences that are "highly speculative." *See Golden Gate Rest. Ass'n*, 512 F.3d at 1126. In other words, the court should weigh the public interest in light of the *likely* consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence. *See id.*; *cf. Eccles v. Peoples Bank of Lakewood Vill.*, 333 U.S. 426, 434 (1948) (concluding that a grievance that is "too remote and insubstantial" or "too speculative in nature" does not justify an injunction or declaratory relief).

Finally, the district court should give due weight to the serious consideration of the public interest in this case that has already been undertaken by the responsible state officials in Washington, who unanimously passed the rules that are the subject of this appeal. *See Golden Gate Rest. Ass'n*, 512 F.3d at 1127 ("The public interest may be declared in the form of a statute." (internal quotation marks omitted)); *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful

independence of state governments in carrying out their domestic policy." (internal quotation marks omitted)).

This case may present a situation in which "otherwise avoidable human suffering" results from the issuance of the preliminary injunction. *Golden Gate Rest. Ass'n*, 512 F.3d at 1125. The district court clearly erred by failing to consider the public interest at stake.

## 4.   Scope of Injunction

**[31]** "Injunctive relief . . . must be tailored to remedy the specific harm alleged." *Lamb-Weston*, 941 F.2d at 974. "An overbroad injunction is an abuse of discretion." *Id.*

The district court should have limited the injunction to the named Appellees, as was requested by Appellees themselves in their initial motion for a preliminary injunction, or even to the named Appellees and their employers as requested in Appellees' subsequent motion for modification of the injunction. Instead, the court issued an overbroad injunction, enjoining enforcement of the new rules "against any pharmacy which, or pharmacist who, refuses to dispense Plan B but instead immediately refers the patient either to the nearest source of Plan B or to a nearby source for Plan B." *Stormans*, 524 F. Supp. 2d at 1266. The district court abused its discretion in enjoining the rules themselves as opposed to enjoining their enforcement as to the plaintiffs before him who asserted religious objections to dispensing Plan B.

**[32]** By enjoining enforcement of the rules, the district court erroneously treated the as-applied challenge brought in this case as a facial challenge. This flies in the face of the well-established principle that "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We . . . enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Ayotte v. Planned Parenthood of N. New*

*England*, 546 U.S. 320, 328—29 (2006). There is no evidence that every pharmacist in the state of Washington considers dispensing Plan B to be a breach of their religious or moral values, and it is unlikely that this is the case.

[33] The district court abused its discretion by enjoining the enforcement of the antidiscrimination provisions as to *all* pharmacists and pharmacies in the state of Washington who refuse to sell or dispense Plan B for *any* reason—religious or otherwise—as long as a patient is immediately referred to a "nearby source" for Plan B. It failed to tailor the injunction to remedy the specific harm alleged by the actual Appellees—an infringement of their First Amendment right to free exercise of religion. Because the injunction does not limit permissible refusals to those based on religious grounds, it permits pharmacies or pharmacists to refuse to provide Plan B for any reason, including refusals grounded in individual morals, conscience, or even personal distaste or discriminatory prejudices. The Free Exercise Clause, however, only protects the free exercise of religion. U.S. Const. amend. I. It does not protect those with moral or other objections. *Cf. Ariz. Life Coal. Inc. v. Stanton*, 515 F.3d 956, 972 (9th Cir. 2008) (finding that speech opposing abortion is not speech that promotes faith or a specific religion). Further, the First Amendment certainly does not protect discriminatory conduct, such as a refusal to serve patients based on race or sex—it may not even protect such discriminatory practices when they are grounded in religious beliefs. *See Bob Jones Univ.*, 461 U.S. at 604 (upholding denial of tax-exempt status to private schools that racially discriminated because of sincerely held religious beliefs). Therefore, the injunction, supposedly based on a free exercise challenge to the new rules, is fatally overbroad because it is not limited to the only type of refusal that may be protected by the First Amendment—one based on religious belief.

[34] Limiting any injunction to the three Appellees—and to the harms alleged and the relief requested—would also miti-

gate much of the potential harm that Intervenors, patients and their families, and the general public in the state of Washington would otherwise face under an injunction that allows any and all pharmacies and pharmacists to refuse to dispense Plan B for any reason. The record reflects that the Stormans' pharmacy at Ralph's Thriftway is located in Olympia, Washington, within a five-mile radius of approximately thirty other pharmacies. Enjoining enforcement of the rules as against Stormans only would not present great hardships to the Intervenors or the public, as they would continue to have access to desired medications, including Plan B, at numerous alternative pharmacies in the same area until the trial on the merits is complete. Similarly, enjoining enforcement of the rules against Mesler and Thelen will not present a great hardship to Intervenors or the public, who will only need to avoid the one additional pharmacy where Mesler works out of more than a thousand pharmacies in the state of Washington, since Thelen's employer already accommodates her religiously based refusal.

**[35]** The record does not support an injunction that is directed to persons other than the parties before the court and their employers. We therefore remand to the district court for consideration of whether the new rules pass rational basis review, whether the Appellees are likely to suffer irreparable harm, whether the balance of equities tips in the Appellees' favor, and whether the public interest supports the injunction. If the district court finds an injunction is warranted, the injunction must be limited to the named Appellees, and, if the court finds necessary, to their employers.

## 5.  Remaining Claims

Because the original injunction was predicated only upon Appellees' free exercise claim, we find it unnecessary to reach Appellees' equal protection, preemption, procedural due process, and Title VII claims. While we have the discretion to "affirm the district court on any ground supported by the

record," *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000) (internal quotation marks omitted), in light of the undeveloped record, we decline to do so. *Cf. Big Country Foods, Inc. v. Bd. of Educ. of the Anchorage Sch. Dist.*, 868 F.2d 1085, 1087—88 (9th Cir. 1989) ("We question the appropriateness of [movant's] attempt to use the appellate process to resolve a question that must first be resolved in the district court.").[17]

## IV.   CONCLUSION

We hold that the district court abused its discretion in applying an erroneous legal standard of review, failing to properly consider the balance of hardships and the public interest, and entering an overbroad injunction. On remand, the district court must apply the rational basis level of scrutiny to determine whether Appellees have demonstrated a likelihood of success on the merits. The district court must also determine whether Appellees have demonstrated that they are likely to suffer irreparable harm in the absence of preliminary relief, whether the balance of equities tips in the favor of the three Appellees, and whether the public interest supports the entry of an injunction. If the court finds in favor of Appellees, it must narrowly tailor any injunctive relief to the specific threatened harms raised by Appellees. The order granting the preliminary injunction is **REVERSED**; the preliminary injunction is **VACATED**; and the case is **REMANDED** to the district court for further proceedings consistent with this opinion. The claims against HRC Appellants are **DIS-MISSED** as not ripe. The motion to strike that portion of

---

[17]The State Appellants' partial opposition to Appellees' Motion to Exceed Type-Volume Limitation was construed by this court, on April 23, 2008, as a motion to strike Section V.B. of Appellees' answering brief, which addresses the Title VII claim. We grant the motion to strike.

Appellees' brief that addresses the Title VII claim is **GRANT-
ED.**[18]

---

[18]The new rules, Washington Administrative Code sections 246-863-
095 and 246-869-010, are effective as of the filing date of this opinion,
and, except to the extent that the district court, upon reconsideration in
light of this disposition, issues a preliminary injunction as to the named
plaintiffs and their employers, may be enforced in accordance with the law
of the state of Washington.